THE HONORABLE JAMES L. ROBART

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| BRETT CALDWELL, an individual,<br><br>                                    Plaintiff,<br><br>            v.<br><br>THE BOEING COMPANY, a Delaware Corporation and DOES 1–10,<br><br>                                    Defendant. | Case No. 2:17-cv-01741-JLR<br><br>**DEFENDANT THE BOEING COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>NOTE ON MOTION CALENDAR: FEBRUARY 15, 2019 |

In accordance with Federal Rule of Civil Procedure 56 ("Rule 56"), Defendant The Boeing Company ("Boeing" or the "Company") seeks summary judgment on the entirety of the two remaining claims asserted by Plaintiff Brett Caldwell ("Caldwell") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, et seq.

## I.    <u>INTRODUCTION</u>

In February 2017, Boeing fired Caldwell for excessive personal use of his work-issued laptop on Company time after an independent corporate investigation substantiated that he was surfing the Internet for personal reasons during *43%* of the time he was otherwise supposed to be working.

Despite Caldwell's repeated admissions that he violated Boeing policy in this way—both during the investigation itself, and again during his sworn deposition in this case—he nevertheless claims that Boeing acted unlawfully in terminating his employment.  Specifically, Caldwell contends that Boeing (1) discriminatorily discharged him because of his race (African-American) and (2) subjected him to a racially hostile work environment.  These contentions are not supported by admissible evidence.  Even taking Caldwell's self-serving, uncorroborated, and speculative allegations at face value for purposes of summary judgment, the undisputed record developed in discovery confirms that no reasonable jury could find in Caldwell's favor on either of his claims.

*First,* Caldwell's disparate-treatment discrimination claim fails because he cannot establish a prima facie case of unlawful discrimination, much less put forward specific evidence to show that Boeing's legitimate and nondiscriminatory reason for his termination is "unworthy of belief" or a pretext for intentional discrimination.  In support of the investigation's finding that Caldwell's excessive personal Internet use on Company time amounted to nearly half of his workday, Caldwell admitted in a voluntary, signed statement that he used his work laptop to visit social media sites such as Twitter, Facebook, and YouTube, and that it was common for him to be on the Internet for personal use periodically during his work.  Because of the severity of Caldwell's Internet usage, his case went directly to a committee of Boeing employees, which, after careful

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 1

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

and deliberative review, determined that Boeing should terminate his employment.  The process

foreclosures any suggestion of racial discrimination because, aside from his own manager who sat

on the committee (and who actually voted against discharge) and the HR representative, no one on

the committee had ever met Caldwell, let alone knew his race.  Caldwell does not and cannot

otherwise show that he was somehow singled out or treated differently for his Internet-usage

violation.  Instead, the undisputed record shows that Boeing consistently applies this policy to

employees of all different races, terminating similarly-situated employees for even less serious

Internet-usage violations than those committed by Caldwell.

**Second,** Caldwell's hostile-work-environment claim is equally without merit for several

independent and mutually reinforcing reasons.  To start, the vast majority of the allegations raised

by Caldwell occurred more than 300 days before he filed his charge with the Equal Employment

Opportunity Commission ("EEOC") and are unrelated to Caldwell's timely allegations.  Most of

his alleged claim is therefore time-barred under Title VII.  The handful of allegations that do fall

within the actionable limitations period are insufficient as a matter of law to create a viable hostile

work environment.  Caldwell's allegations of offensive comments by an anonymous employee in

the tooling department and a "nitpicking" team lead are neither severe nor pervasive enough to

meet the high bar required to establish such a claim.

To the extent Caldwell attempts to bootstrap his time-barred allegations in an effort to

salvage his claim, that gambit should fail for several reasons.  Most significantly, Caldwell

transferred to an entirely different worksite (in Everett, Washington) about midway through his

Boeing employment, after which time he had no further contact with the co-workers he claims

harassed him at the first site.  Settled precedent establishes that Caldwell's transfer created a new

work environment, such that any of his preceding allegations are separate and distinct from any

allegations that might follow.  Furthermore, even at the Everett location, Caldwell's prior, time-

barred allegations are similarly insufficient to establish a race-based hostile-work-environment

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 2

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

1    claim.  In his own deposition, Caldwell admitted that most of his allegations are race-neutral or

2    speculation on his part, or otherwise lack any evidence of discriminatory intent.  And even if

3    Caldwell's remaining allegations have an evidentiary basis, which Boeing disputes, governing

4    precedent shows that those allegations do not rise to the requisite level of severity or pervasiveness

5    to constitute an actionable hostile work environment.  At bottom, Caldwell alleges a series of

6    everyday workplace grievances occurring sporadically over the course of years—many of which

7    he has admitted had no racial connection and cannot be supported with competent evidence.

8         Although certain of Caldwell's allegations were enough to survive the plausibility standard

9    at the motion-to-dismiss stage, discovery has not helped his cause.  Now, with the benefit of a fully

10   developed factual record, the undisputed evidence confirms that there are no issues of material fact

11   here that warrant submitting this case to a jury, and the Court should therefore grant summary

12   judgment in Boeing's favor on both of Caldwell's remaining claims.

13   **II.    STATEMENT OF UNDISPUTED MATERIAL FACTS**

14        **A.    Caldwell's Employment with Boeing.**

15        Caldwell began working for Boeing on January 11, 2013, in composite fabrication at

16   Boeing's manufacturing facility in Frederickson, Washington.  (Deposition of Brett Caldwell

17   ("Caldwell Dep.") at 72:14–73:1.)[1]  His job duties consisted of fabricating components for the

18   Boeing 777 and 787 aircraft (*id.* at 72:14–73:15), and he reported to a number supervisors of

19   different races during his tenure at the plant. (*Id.* at 73:22–74:8, 77:6–78:8.)

20        In November 2015, Caldwell left Boeing's Frederickson location and transferred to an

21   entirely different facility in Everett: Boeing's Composite Wing Center ("CWC").  (*Id.* at 75:9–20;

22   Declaration of Dean Bogardus ("Bogardus Decl.") ¶ 3.)  The CWC houses Boeing's Automated

23   Fiber Placement ("AFP") machines used to manufacture the giant composite wings of Boeing's

24   next commercial jetliner, the 777X aircraft. (*Id.*)  The $1 billion CWC was still under construction

25

26   [1] All relevant deposition excerpts are appended to the Declaration of Zachary Stinson.

when Caldwell transferred, and it opened in May 2016.  (*Id.*)  While in Everett, Caldwell worked as an AFP Operator, fabricating the 777X's composite wings and other aircraft components.  (Caldwell Dep. at 75:14–76:22; Bogardus Decl. ¶ 5.)  Caldwell's supervisor at the CWC in Everett was Dean Bogardus.  (Caldwell Dep. at 75:21–76:1; Deposition of Dean Bogardus, Corporate Designee ("Bogardus Corp. Dep.") at 12:24–13:6; Bogardus Decl. ¶ 5.)  At all times during his employment with Boeing, Caldwell was subject to the terms and conditions of a collective bargaining agreement with the International Association of Machinists and Aerospace Workers, No. 751 ("IAM" or the "Union").  (Caldwell Dep. at 73:16–21; Declaration of Steve Morton ("Morton Decl.") ¶ 3.)

### B.  Caldwell's Excessive Personal Telephone and Internet Usage at Everett.

The AFP machines at the CWC are sophisticated, world-class aerospace manufacturing technology operated mainly by computer.  (Bogardus Decl. ¶ 4.)  To help Caldwell perform his job duties, Bogardus gave him a Company laptop computer soon after he started at the Everett CWC.  (Caldwell Dep. at 104:14–104:24; Bogardus Decl. ¶ 6.)  Caldwell used the laptop to document steps involved in the composite manufacturing processes.  (Bogardus Corp. Dep. at 26:21–24.)  The laptop only worked while it was on site at the CWC, and Caldwell only used the laptop while at work.  (Caldwell Dep. at 103:22–104:11, 106.)  Caldwell had no business use for the Internet, and, during AFP composite builds, employees were on the production floor, with other time being used for cleaning and performing online training.  (Bogardus Decl. ¶ 6.)

During Caldwell's time at the CWC, Bogardus and others observed him on his personal cellular phone during working hours.  (Bogardus Corp. Dep. at 40:16–41:3; Bogardus Decl. ¶ 12.)  Caldwell's personal phone usage became so noticeable that Bogardus repeatedly coached Caldwell that he was not to be on his cell phone during work times.  (Bogardus Corp. Dep. at 40:20–41:3 (Caldwell was on his cell phone "[m]ultiple times a day every day").)

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 4

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

While Caldwell stopped using his personal cell phone during work hours (a change possibly spurred by Caldwell's loss of service on his personal phone), Caldwell did not stop—and indeed increased—using his work laptop to "surf the net," including repeated visits to Twitter, Facebook, Yahoo!, and other websites throughout the workday.  (Caldwell Dep. at 107:18–108:15; Bogardus Corp. Dep. at 41:15–22.)  Bogardus was unaware that Caldwell was on his laptop to such a great extent for personal use because every time Bogardus approached Caldwell, it appeared from the computer screen that Caldwell was completing online work-related training or other work responsibilities.  (Bogardus Corp. Dep. at 24:13–24; Bogardus Decl. ¶ 13.)[2]

## C.  Boeing Corporate Investigations Conducts an Independent Inquiry Into Caldwell's Computer Usage.

In mid-December 2016, Boeing received an anonymous ethics complaint that Caldwell was misusing Company time by being on Facebook and watching YouTube videos throughout the workday.  (Declaration of Richard Petrey ("Petrey Decl.") ¶ 3.)  After receiving this complaint and opening an investigation, Boeing's Corporate Investigations group installed monitoring software on Caldwell's work laptop that allowed Boeing to monitor how Caldwell (who would have had no knowledge that the software was deployed) was using his work laptop during the workday— namely whether he was using it for work or personal purposes.[3]  (Id. ¶ 5.)  Boeing monitored Caldwell's work laptop usage from December 22, 2016 to January 6, 2017.  (Id. ¶ 6.)  During this

---

[2] After learning about the extent of Caldwell's Internet usage, Bogardus remarked that he was "surprised":

> When one of your employees [is] on that much [and] you're not noticing, it doesn't look good on a manager, so that was a failure on my part, I felt.  I'm a pretty trusting person, so I trusted what Brett was doing was what he should have been doing, and the investigation revealed it wasn't.

(Bogardus Corp. Dep. at 24:18–24.)

[3] Boeing implemented its procedures surrounding time theft over excessive Internet usage because of its obligations as a U.S. Government contractor, and it applies its policies equally across its commercial and government-related business divisions.  (Declaration of Kathryn Lewis ("Lewis Decl.") ¶ 6.)  According to its records of individuals terminated for misuse of Company time, Boeing has terminated more than 200 employees other than Caldwell for misuse of Company time generally since 2012, and it terminated the majority of these employees for misuse of Company time by using a computer for non-work related reasons.  (Id. ¶ 11.)

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

1  period, of the forty hours of work Caldwell entered into Boeing's employee timekeeping system

2  ("ETS"), he spent 17.1 hours outside of his lunch and break periods on personal, non-work use of

3  the Internet.  (*Id.* ¶ 7.)  That is, 43% of Caldwell's paid work time was spent on non-work related,

4  personal use of the Internet during this period.  (*Id.*)  More specifically, a review of the computing-

5  resource data revealed that Caldwell was accessing Facebook, Yahoo!, Twitter, Instagram, and

6  YouTube for personal use from his work laptop while he was being paid to perform is Boeing job

7  duties.  (*Id.* ¶ 8.)

8        As part of Boeing's investigation, both Caldwell and Bogardus were interviewed.  (*Id.* ¶

9  9.)  In a voluntary, signed statement, Caldwell admitted that he "visited social media sites such as

10  Twitter and Facebook," and that he did "not typically use the Internet for work related matters."

11  (*Id.* ¶ 10; Caldwell Dep. at 122:20–123:2; Caldwell Statement (Jan. 31, 2017), Petrey Decl., Ex.

12  1.)  Caldwell also stated that he would "check social media throughout the day," and it was possible

13  that he spent about three and a half hours per day on the Internet for personal use during that period.

14  (Petrey Decl. ¶ 11; Caldwell Statement (Jan. 31, 2017).)  In other words, even by Caldwell's own

15  admission, he spent more than 43% of an eight-hour workday (3.5 hours) engaged in personal

16  Internet use.  Caldwell confirmed that he recalled "visiting sites looking for cars for sale, real

17  estate, and the social media sites Facebook and Twitter," and that it was "common for [him] to be

18  on the Internet for personal use periodically during [his] work checking social media."  (Petrey

19  Decl. ¶ 12; Caldwell Statement (Jan. 31, 2017).)  In his deposition, Caldwell again admitted that

20  he used his work computer during work time to surf the Internet and use social media for personal

21  entertainment.  (Caldwell Dep. at 107:18–108:2.)

22        Boeing's independent investigation found that Caldwell "engaged in excessive personal

23  Internet usage while on company time" and was "responsible for entering approximately 46.2

24  hours of questionable time" into Boeing's ETS—in other words, "43% of the time Mr. Caldwell

25  submitted during the [investigation] period [was] questionable."  (Petrey Decl. ¶ 16; Investigation

26

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 6

**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

Report, Petrey Decl., Ex. 2.)  Based on Caldwell's statement, it was estimated that he engaged in that high level of personal Internet activity since at least December 15, 2016.  (Petrey Decl. ¶ 14; Investigation Report.)

### D.  Boeing's Relevant Policies Related to Excessive Personal Internet Use.

Boeing has several Policies, Procedures, and Business Process Instructions that address an employee's improper Internet usage on Company time or with Company equipment.  (Lewis Decl. ¶ 3; Misuse/Mischarging ECARB Guidelines, Lewis Decl., Ex. 7.)  Boeing's Employee Corrective Action Process Requirements ("ECAPR") contains a violations matrix that identifies different behaviors for which Boeing imposes corrective action, the default level of corrective action for each violation, and mitigating and aggravating factors.   (Lewis Decl. ¶ 7; ECAPR, Lewis Decl., Ex. 3.)

Category 3F is "Misuse of Company Time," which is described as "Unauthorized use of company time spent on non-work-related activities or activity that is not supportive of the work assignment."  (Lewis Decl. ¶ 8; ECAPR.)  According to the ECAPR, a 3F violation can lead to time off from work, though aggravating factors of "excessive time or incidents" can lead to termination. (Lewis Decl. ¶ 9; ECAPR.)   Although not a bright-line rule, Boeing regards non-work related activities that take up more than 20% of an employee's work hours to constitute excessive time spent on non-work activities and an aggravating factor that will lead to discharge. (Lewis Decl. ¶ 10; Misuse/Mischarging ECARB Guidelines.)  The ECAPR also provides that "All Misuse of Company Time cases must be reviewed by an ECARB per BPI-3946."  (Lewis Decl. ¶ 13; ECAPR.)

Consistent with Boeing's policy, Caldwell's documented and admitted use of the Internet for non-work activities was submitted to a Boeing Employee Corrective Action Review Board ("ECARB" or the "Board") for the review, evaluation, and disposition of his misconduct.  (Lewis Decl. ¶ 16; Petrey Decl. ¶ 17.)

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 7

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

### E. The ECARB Determines Caldwell's Computer Usage in the "Upper Echelon" of Internet Abuse Cases, Warrants Termination.

Boeing uses the ECARB as a formal process to carefully review more significant cases of misconduct for corrective actions to be applied consistently. (Lewis Decl. ¶ 14.)

Caldwell's ECARB was conducted on February 8, 2017. (Declaration of Steven Miller ("Miller Decl.") ¶ 3.) The ECARB that reviewed Caldwell's case was composed of eight members: Steven Miller as chair; a standing member from Ethics; four ECA ("Employee Corrective Action") standing members; Bogardus as Caldwell's manager; and Michael Edmiston, the relevant HR representative. (Lewis Decl. ¶ 18; Miller Decl. ¶ 3; Bogardus Corp. Dep. at 22:24–23:3; Bogardus Decl. ¶ 15.) The Board members were able to review the written investigation report detailing Caldwell's 46.2 hours of questionable time before the meeting convened by telephonic conference. (Lewis Decl. ¶ 19; Miller Decl. ¶ 3; Bogardus Decl. ¶ 15.) Richard Petrey, the investigator assigned to Caldwell's case, attended to present the investigation findings and answer any questions, but had no vote in the matter. (Petrey Decl. ¶ 18.) Other than Bogardus and Edmiston, no one on the ECARB ever met Caldwell or was told his race (Bogardus Decl. ¶ 15; Edmiston Decl. ¶ 7), and ECARB members are not provided the race of employees, only names (Miller Decl. ¶ 3).

After reviewing the report of Caldwell's personal Internet usage during work, the ECARB determined that the facts uncovered by the investigation placed Caldwell in the "upper echelon" of personal Internet abuse cases. (*Id.* ¶ 4.) Because Caldwell was above a benchmark of 20% of personal Internet use (i.e., one full workday per week), this was an aggravating factor for the 3F offense. (*Id.* ¶ 4; Lewis Decl. ¶ 21.)

As the undisputed data show, Boeing has discharged more than 200 employees for similar 3F time-misuse offenses. (Lewis Decl. ¶ 11; 3F Terminations Chart, Lewis Decl., Ex. 4.) Of those individuals, at least 137 are White, and 16 are African-American. (3F Terminations Chart.) And nearly *two-thirds* of the White 3F offenders spent *less* work time than Caldwell misusing the

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 8

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

Internet.  (*See id.* (showing 89 out of 137 terminations of White employees for under 43% of time misuse).)

The initial vote on Caldwell's offense by the ECARB members resulted in a tie regarding the appropriate level of discipline (time off from work or discharge), with Miller initially abstaining the first voting round as chair.  (Miller Decl. ¶ 5.)  For his part, Bogardus advocated for retaining Caldwell and would have disciplined Caldwell with time off from work instead of discharge.  (Bogardus Corp. Dep. at 23:12–23:15; Bogardus Decl. ¶ 16.)  In order to break the tie, Miller voted during a second round with other members of the ECARB for Boeing to terminate Caldwell's employment because of his admitted and documented excessive Internet usage, which had no mitigating factors.  (Miller Decl. ¶ 5; Lewis Decl. ¶ 22.)[4]

On February 10, 2017, Bogardus informed Caldwell, who was accompanied by two of his Union representatives, that Boeing had terminated his employment for his misuse of Company time.  (Caldwell Dep. at 81:20–82:20; Bogardus Decl. ¶ 18.)  Caldwell's Union representatives requested the underlying disciplinary documentation shortly after his termination.  (Morton Decl. ¶ 4.)  After reviewing the file, however, the Union dropped any challenge to Caldwell's termination.  (Morton Decl. ¶ 5.)

**F.     The Instant Action.**

Several months later, on August 17, 2017, Caldwell filed a charge of discrimination with the EEOC, and he received a Notice of Right to Sue on August 23, 2017.  (Third Am. Compl. ¶ 25 & Ex. 1 (Dkt. 32).)  Caldwell filed the instant action on November 17, 2017.  (Dkt. 1.)  Caldwell asserts two claims against Boeing for racial discrimination under Title VII: (1) disparate treatment arising out of his termination, and (2) a racially hostile work environment.

---

[4] Bogardus, continuing his advocacy on Caldwell's behalf, pursued the potential for an appeal of the ECARB's termination decision.  (Bogardus Decl. ¶ 17.)  Bogardus sought the support of his own manager, Norine Murray, for the appeal, but Murray declined to seek an appeal of the ECARB's majority-vote determination.  (*Id.*)  Bogardus anticipated, albeit incorrectly, that Caldwell's Union would grieve the termination.  (*Id.*)

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 9

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

Caldwell contends that Boeing acted unlawfully when it terminated his employment.  He claims that his termination was related to his race because of a run-in with an anonymous white male around the same time he was investigated for excessive personal computer usage.  (Caldwell Dep. at 87:8–13.)  But Caldwell admits that any connection from the hotline tip to his race is based only on his assumptions.  (*Id.* at 111:4–112:21.)

Aside from his disagreement with the investigative report and a general objection to his termination, Caldwell admits that his Internet usage during Boeing's investigation fell within the definition of misuse of Company time.  (*Id.* at 132:7–133:6.)  Caldwell agrees that Boeing followed ECARB procedure in arriving at its decision to terminate his employment.  (*Id.* at 137:3–138:1.)  Caldwell cannot dispute that Boeing has terminated a greater number of Caucasians than African-Americans for 3F time-misuse violations, with the majority of those terminations for less egregious usage than Caldwell's.  Caldwell also cannot identify any potential similarly situated comparators even after having a full opportunity to conduct discovery.  (*Id.* at 124:3–17.)

In support of his hostile-work-environment claim, Caldwell alleges that incidents at varied intervals throughout his four-year employment at Boeing constituted racial harassment.  But only two fall within the applicable limitations period, while Caldwell was working at Everett, and as set forth below.  After September 2016, Caldwell took issue with his team lead Tom Hammond, whom he alleges would "bark orders" at him.  (Caldwell Dep. at 271:3–9; *see* Bogardus Decl. ¶ 10.)  Caldwell alleges that when he asked why Hammond had a problem with him, Hammond stated that he was "afraid" of Caldwell because of the "way he was raised."  (Caldwell Dep. at 269:11–13.)  According to Caldwell, however, Hammond did not reference Caldwell's race.  (*Id.* at 269:15–17.)  Additionally, Caldwell alleges that, in December 2016, an anonymous white male from the tooling department made "monkey gestures" and said "I can't stand you blacks."  (*Id.* at 205:11–206:11.)[5]

---

[5] Caldwell raised this alleged incident to Bogardus in December 2016.  (Bogardus Decl. ¶ 11.)  In response, Bogardus partnered with Edmiston to investigate the alleged incident, including collecting information from witnesses.

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 10

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

### G.      Procedural History.

As the Court knows, Boeing originally moved to dismiss many of Caldwell's claims pursuant to Fed. R. Civ. P. 12(b)(6).  (*See* Dkt. 19.)  In response, Caldwell amended his complaint, and Boeing then renewed its motion to dismiss on similar grounds.  (*See* Dkts. 22, 24, 25.)  Ultimately, the Court agreed that Caldwell failed to state plausible claims for retaliatory hostile work environment under Title VII and for the tort of outrage (i.e., intentional infliction of emotional distress) and dismissed those counts.  (*See* Dkt. 31.)  As to Caldwell's claim for race harassment under Title VII, however, the Court found that Caldwell's allegations—presumed true at the pleading stage—were sufficiently plausible to entitle him to discovery.  (*See id.*)[6]

Caldwell subsequently filed his third amended complaint (now, his operative pleading), and Boeing timely answered.  (Dkts. 32, 35.)  For the next six months, the case proceeded to discovery, with the parties exchanging hundreds of pages of documents and completing over a half-dozen depositions.  Boeing deposed Caldwell and two of his friends whom he disclosed as potential witnesses.  For his part, Caldwell chose to depose five Boeing witnesses: his former supervisor, Bogardus (who was deposed in both his capacity as a manager and as corporate representative), his former team lead, Hammond, and three former co-workers.

As Boeing's motion explains, although the Court earlier concluded that Caldwell was entitled to favorable inferences that rendered dismissal of his race harassment claim improper based on the pleadings alone, the fully developed factual record in discovery now confirms that Caldwell's remaining claims are foreclosed as a matter of law and undisputed facts.

## III.      ARGUMENT AND AUTHORITIES

### A.      Summary Judgment Standard.

---

(Edmiston Decl. ¶ 9.)  After being unable to substantiate Caldwell's version of events, and receiving numerous witness statements that rebutted Caldwell's story, Edmiston also submitted Caldwell's allegations to Boeing's EEO group.  (*Id.* ¶ 9.)

[6]  Recognizing that Caldwell's disparate-treatment claim for discriminatory termination would require the Court to evaluate matters outside the pleadings, Boeing did not move to dismiss that claim under Rule 12(b)(6).

Summary judgment is designed to avoid unnecessary trials when there is no dispute as to the material facts. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Under Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Vasquez v. Cnty. of Los Angeles,* 349 F.3d 634, 639–40 (9th Cir. 2003). To avoid summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "must produce at least some significant probative evidence tending to support the complaint," *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A mere "scintilla" of evidence is not enough, nor are bare allegations, speculations, or conclusions. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996). "[U]ncorroborated and self-serving" testimony also cannot create a genuine issue of material fact. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

## B.   Caldwell's Disparate-Treatment Claim Fails as a Matter of Law.

Under the familiar *McDonnell Douglas* scheme, Caldwell bears the burden of first establishing a prima facie case of discrimination by adducing evidence to satisfy all of these elements: (1) he is a member of a protected class; (2) he was qualified for his position and performing satisfactorily; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside the claimed protected class were treated more favorably, or other circumstances give rise to an inference of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). If, and only if, Caldwell can establish a prima facie case, the burden would shift to Boeing to articulate a legitimate, nondiscriminatory reason for its actions. Once Boeing does so, Caldwell would be required to "raise a triable issue of material fact" based on

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 12

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

1  "specific evidence" to show that Boeing's explanation is "unworthy of belief" and instead a pretext

2  for intentional discrimination.  *Id.* at 1155; *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1106,

3  1108 (9th Cir. 2008).  "Despite the burden shifting, the ultimate burden of proof remains always

4  on [Caldwell] to show that [Boeing] intentionally discriminated because of [his race]."  *Coleman*

5  *v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).

6         **1.**        **Caldwell Cannot Establish His Prima Facie Case.**

7        While Boeing does not dispute that Caldwell is a member of a protected class and that he

8  was fired, his claim nevertheless fails at the prima facie stage because he cannot satisfy the two

9  other essential elements of his case.

10          **a.**        <u>**Caldwell Cannot Show That His Performance Was Satisfactory.**</u>

11        Caldwell cannot meet the second element of his prima facie case because the undisputed

12  evidence shows that he was not performing satisfactorily, or otherwise meeting the terms and

13  conditions of his employment, at the time of his termination.  Caldwell admitted in his deposition

14  that he often would use his Boeing-issued laptop throughout the workday to surf the Internet for

15  personal use, including spending time on social media sites such as Twitter, Facebook, and

16  Instagram; viewing videos on YouTube; and perusing car and real estate listings.  (Caldwell Dep.

17  at 103:22–107:23.)  It is also undisputed that Caldwell gave a statement to the Boeing investigator

18  confirming his personal use of the Internet, and admitting the possibility that he was wasting nearly

19  three and a half hours each workday.  (Petrey Decl. ¶ 11; Caldwell Statement (Jan. 31, 2017).)

20  Caldwell also acknowledges that his computer usage, as calculated during the investigation, fell

21  within the definition of Boeing's ECAPR Code 3F/PRO-10, which proscribes misuse of Company

22  time.  (Caldwell Dep. at 132:17–133:6.)

23        Based on the undisputed—and admitted—evidence of Caldwell's violation of Boeing

24  policy and misuse of Company time through excessive Internet usage, no reasonable finder of fact

25  could conclude that he was performing his job duties in a satisfactory manner.  *See, e.g.*, *Weil v.*

26

*Citizens Telecom Servs. Co., LLC*, No. C15-0835JLR, 2016 WL 5851868, at *8–9 (W.D. Wash. Oct. 6, 2016) (finding plaintiff's job ratings below acceptable and failure to comply with PIP precluded satisfying his prima facie case, and granting summary judgment for employer); *Villiarimo*, 281 F.3d at 1062 & n.8 (affirming district court decision finding plaintiff did not meet prima facie requirement where plaintiff admitted to underlying rule violation (citing *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir. 1988))); *Salas v. Indep. Elec. Contractors Inc.*, No. C12–277RAJ, 2013 WL 1898249, at *7 (W.D. Wash. May 7, 2013) (finding that plaintiff could not state prima facie case where he admittedly violated work policy and was subsequently discharged); *Bragg v. Caterpillar Inc.*, No. 09 C 7102, 2011 WL 1131325, at *7 (N.D. Ill. Mar. 28, 2011) (plaintiff failed to show satisfactory performance by conceding violations).

### b. Caldwell Cannot Identify Any Comparators Who Received More Favorable Treatment.

The settled evidence shows that Caldwell also cannot meet the fourth element of his prima facie case. Caldwell must not only show that employees outside his protected class received more favorable treatment by Boeing, he also must bring forward evidence—as opposed to mere speculation—to show that these employees are similar in all material respects. *Morgan v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Caldwell cannot meet these requirements. In fact, the undisputed evidence reflects just the opposite.

*First*, Boeing has discharged hundreds of employees—of all different races—after investigations substantiated that they had committed the same or similar Internet-usage violations as did Caldwell. (Lewis Decl. ¶¶ 11, 12; 3F Terminations Chart.) In fact, Boeing has discharged more than eight times as many Caucasian than African-American employees, and at least 89 Caucasian employees who had far less egregious percentages of wasted time. (*See* 3F Terminations Chart.) Caldwell has no evidence to the contrary. (Caldwell Dep. at 124:3–8 (Caldwell "had no clue" that Boeing terminated others for excessive Internet use, or their races).)

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 14

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

In short, Caldwell cannot dispute that Boeing has treated investigated employees found abusing the Internet on Company time evenhandedly.

*Second*, although Caldwell contends that his fellow employees were not similarly disciplined for using the Internet on their phones or available work computers, that assertion rests on nothing but speculation and conjecture. Caldwell testified that he has no knowledge of how much time anyone else at Boeing spent on the computer while he was employed, let alone whether other employees were engaged in personal activity on their computers (as opposed to legitimate work-related business). (Caldwell Dep. at 147:23–148:8 ("[E]veryone in our area was on their computer doing something" when there was downtime, and he "could only assume that [they] were all engaging in the same activity or similar activity.").) Caldwell states that his assertions are not based on time comparisons (*id.* at 152:13–153:2); that he "didn't pay much attention" (*id.* at 155:20–25); and that he never witnessed others on the Internet. (*Id.* at 165:18–166:19.) Again, Caldwell has not adduced, and cannot adduce, evidence of similar conduct by his supposed comparators. Because Caldwell cannot meet two of the four prima facie requirements, his claim of disparate treatment fails.

### 2.    Caldwell Cannot Show That Boeing's Rationale Was Pretextual.

Even if Caldwell could establish a prima facie case of discrimination (which he cannot), his claim would still fail because he cannot show, let alone through "specific evidence," *Coleman*, 232 F.3d at 1282, that Boeing's legitimate, nondiscriminatory reason for his termination was false and merely a pretext to cover up intentional discrimination.

On this issue, the question is not whether Boeing's business justification is "objectively false," but only whether Boeing "honestly believed its reason for its actions," even if others might think the reason "foolish or trivial or even baseless." *Villiarimo*, 281 F.3d at 1063; *see also Sharpe v. AT&T*, 66 F.3d 1045, 1050 (9th Cir. 1995) ("We have long held that discrimination laws are 'not intended as a vehicle for general judicial review of business decisions.'"); *Garcia v. City of*

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

*Everett*, No. 14-cv-30, 2015 WL 1759208, at *7 (W.D. Wash. Apr. 17, 2015) ("[T]he court does not sit as a super personnel department and cannot dictate . . . personnel decisions.").

Armed with only his speculation, conjecture, and guesses, Caldwell cannot marshal even a scintilla of evidence to challenge Boeing's legitimate business decision to terminate his employment in accordance with Company policy, following a careful and thorough investigation and the deliberative and formal ECARB disciplinary process. Caldwell has admitted that he has no actual knowledge of the ethics hotline complaint about his computer usage (Caldwell Dep. at 111:4, 111:2–112:21, 115:2–15), nor any knowledge of the disciplinary process other than suppositions and conjecture (*id.* at 115:16–116:16, 139:2–25, 146:17–21.) And he has admitted that, after review of Caldwell's behavior, Boeing properly followed the ECARB procedures in his termination. (*Id.* at 137:23–138:1.) Even though Caldwell does not allege that Bogardus's supervisor, Norine Murray, ever discriminated against him (*id.* at 140:1–141:4), he believes that Murray's failure to support Bogardus's ECARB appeal efforts was based on Caldwell's race (*id.* at 143:19–25).

In a last-ditch effort to salvage his claim, Caldwell has "guessed" that either his team lead, Hammond, or someone from the tooling department reported his excessive computer usage. (Caldwell Dep. at 112:4–11, 87:8–24.) He suggests that one of those individuals did so because of racial animus, but that assertion is speculative. Plus, it is undisputed that neither of these individuals had any involvement with Caldwell's termination (Bogardus Decl. ¶ 15), such that they have no relevance to the ultimate issue of whether that decision was proper and nondiscriminatory. In the Ninth Circuit, "stray remarks are insufficient to establish discrimination." *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438–39 (9th Cir. 1990) (citations and internal quotation marks omitted).[7] And even if Caldwell had knowledge or evidence of the

---

[7] *See also Sanders v. Potter*, No. C06-1288-TSZ, 2009 WL 57540, at *9 (W.D. Wash. Jan. 8, 2009) (allegedly racist co-worker remark unrelated to employment decision); *see also Davidson v. Korman*, 532 F. App'x 720, 722 (9th Cir. 2013) (although co-worker made two allegedly racist comments, "[n]o reasonable person would consider such remarks made by a co-worker 'an unlawful employment practice of an employer' rather than 'an act of discrimination by a

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 16

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

1   identity of his ethics whistleblower (he does not, *see* Caldwell Dep. at 111:9–11),[8] and even if that

2   individual acted out of bias against him, that action cannot be imputed to Boeing because the

3   underlying ethics complaint opened an independent inquiry and investigation, and it was the

4   independent findings of that inquiry that led to his discharge after the ECARB vote.[9]

5          Without any substantial and specific evidence to support his theory, Caldwell cannot come

6   close to making the necessary showing that Boeing's careful and deliberative termination of his

7   employment, and accompanying rationale, is unworthy of credence. The Court should disregard

8   Caldwell's guesses, suppositions, and conjectures, and enter summary judgment for Boeing.

9          **C.     Caldwell's Hostile-Work-Environment Claim Fails as a Matter of Law.**

10         To state a claim for hostile work environment on the basis of race, Caldwell must meet a

11  high burden to show that (1) he was subjected to verbal or physical conduct because of his race,

12  (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter

13  the conditions of employment and create an abusive working environment. *Manatt v. Bank of Am.*,

14  339 F.3d 792, 798 (9th Cir. 2003). For the third element, one considers "all the circumstances,

15  including the frequency of the discriminatory conduct; its severity; whether it is physically

16  threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

17  with an employee's work performance." *Vasquez*, 349 F.3d at 642 (quoting *Clark Cnty. Sch. Dist.*

18  *v. Breeden*, 532 U.S. 268, 270–71 (2001)). "In addition, the working environment must both

19  subjectively and objectively be perceived as abusive." *Id.*

20

21

22  private individual'"); *Brooks v. King Cnty. Dep't of Dev. & Env't Servs.*, 176 F.3d 481 (9th Cir. 1999) (granting summary judgment where plaintiff had "no evidence linking . . . stray remarks to his termination").

    [8] Nor does Boeing have any knowledge of the identity of the hotline caller. (Petrey Decl. ¶ 3.)

23  [9] *See Poland v. Chertoff*, 494 F.3d 1174, 1183 (9th Cir. 2007) ("[I]f an adverse employment action is the consequence

24  of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer."); *see also Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015) (concluding that commission's

25  independent investigation into charges broke any potential discriminatory bias associated with underlying tip: "To hold otherwise would be to rule that whenever a discriminatory subordinate makes an allegation or institutes a charge

26  and the plaintiff-employee is fired, there are no steps the ultimate decision-maker could ever take to break that chain of proximate causation. That cannot be so.").

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 17

Title VII, however, "is not a general civility code," *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010), and in the Ninth Circuit there is "a high burden to finding a hostile work environment," *Dawud v. Boeing Co.*, No. 17-1254, 2018 WL 4735703, at *6 (W.D. Wash. Oct. 2, 2018) (citing *Manatt*, 339 F.3d at 798–99). "'[I]solated' incidents, occurring sporadically over a long period of time, are not severe or pervasive enough to alter the conditions of employment." *Nguyen v. Boeing Co.*, No. 15-793, 2016 WL 7375276, at *4 (W.D. Wash. Dec. 20, 2016). Nor does the sporadic use of abusive language, crude jokes, or occasional teasing impart employer liability. *Prospect Airport*, 621 F.3d at 998. Likewise, it is not enough to allege that conduct is merely offensive; instead, it must be *so severe* as to alter an employee's working conditions. *Rispoli v. King Cnty.*, No. 14-00395, 2014 WL 6808996, at *3 (W.D. Wash. Dec. 2, 2014).

### 1.   The Majority of Caldwell's Hostile-Work-Environment Allegations Are Untimely.

To begin with, the majority of Caldwell's hostile-work-environment allegations are time-barred and fall decidedly outside the statute of limitations applicable to his claim. Title VII generally prescribes a limitations period that reaches back 300 days before the filing of a Charge of Discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1); *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1202 (9th Cir. 2016). This means that acts occurring outside that 300-day window—here, anything prior to October 21, 2016—are generally time-barred and cannot support a Title VII claim. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) ("If the flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of *timely* non-discrete acts." (emphasis added)). The analysis can be different for hostile-work-environment claims, such that otherwise stale allegations can sometimes be considered in the analysis, but only where the pattern of allegations can be characterized as a single employment practice. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120–21 (2002). Importantly, "merely asserting" that untimely acts comprise a continuous hostile-work-

environment claim "does not make them timely." *Yonemoto v. Shinseki*, 3 F. Supp. 3d 827, 845 (D. Haw. 2014). Rather, the Ninth Circuit has explained that if the otherwise untimely acts did not consist of the "*same type* of employment actions, occur[] *relatively frequently*, [or] were [not] perpetrated by the *same managers*," they cannot form a single unlawful practice, and thus cannot be considered alongside otherwise timely allegations in evaluating a claim for hostile work environment. *Porter*, 419 F.3d at 893 (second alteration in original) (emphases added).

Applying these principles here, Caldwell's claim fails as a matter of law and undisputed facts. He raises only two allegations that fall within the limitations period. But even considered together, those allegations fall decidedly short of the sort of acts that create a hostile work environment. First, Caldwell's singular December 2016 "run in" with the anonymous tooling-department employee whom he alleges gestured at him and stated that he could not "stand you blacks" is not severe or pervasive enough to rise to the level of a legally actionable hostile work environment. *See Henry v. Regents of the Univ. of Cal.*, 37 F. Supp. 3d 1067, 1085–86 (N.D. Cal. 2014) ("isolated instances of offensive conduct are insufficient," citing cases where even multiple uses of "n-word" were not severe or pervasive). And even if that were not true, there is no basis to impute this conduct to Boeing, since the alleged actor was a non-management employee. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) (noting that "an employer can be liable" only "where its own negligence is a cause of the harassment."). Once Caldwell's manager, Bogardus, learned about the allegation, it is undisputed that he and Edmiston promptly investigated and referred the matter to Boeing's EEO committee, and Caldwell does not allege any further conduct on the part of that individual.

Second, Caldwell generally alleges that Hammond, after assuming the role of team lead, was "nitpicking" his work. This allegation comes nowhere close to actionable harassment. Rather, courts routinely hold that this sort of disagreement with a particular management style or approach cannot give rise to a claim under Title VII. *See, e.g.*, *Sumera v. Lynch*, No. 4:13-CV-01950-KAW,

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

2016 WL 368159, at *7 (N.D. Cal. Feb. 1, 2016) (finding that criticisms of work such as "'nitpicking' . . . do not give rise to a hostile work environment"); *White v. FedEx Corp.*, No. C04-00099 SI, 2006 WL 618591, at *9 (N.D. Cal. Mar. 13, 2006) ("'[N]itpicking' does not rise to the level of creating a hostile work environment."). Because these allegations, whether considered alone or in concert, cannot have created a hostile work environment as a matter of law, the Court should enter judgment in Boeing's favor.

### 2. Caldwell Cannot Bootstrap Earlier Allegations to Bolster His Hostile-Work-Environment Claim.

To the extent Caldwell attempts to save his claim by tacking on untimely allegations, this argument would fail for several reasons.

First, Caldwell's transfer to Everett cuts off any arguable relevance as to his allegations from Frederickson, which is a totally different worksite where he worked alongside totally different managers and colleagues. Caldwell testified, of Everett, that "it felt like I was moving into a new . . . form of Boeing than [he] was used to at Frederickson." (Caldwell Dep. at 77:4–5.) Indeed, the transfer created more than just a feeling—as courts routinely hold—it severed any notion of a continuous or related hostile work environment lasting throughout his entire employment. *See, e.g.*, *Fairley v. Potter*, No. 1-1363, 2003 WL 403361, at *10 (N.D. Cal. Feb. 13, 2003) (incidents not part of same work environment where plaintiff transferred to new location and asserted no links between personnel or events other than same employer); *Gonzalez v. Cnty. of Yolo*, No. 2:13-cv-01368, 2015 WL 4419025, at *7 (E.D. Cal. July 17, 2015) ("Moving to a new job away from a harassing supervisor often disrupts a continuing practice of harassment."); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010) (alleged incidents from when plaintiff worked in production unrelated to alleged environment after transfer to estimating); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 329–30 (5th Cir. 2009) (plaintiff's internal transfer rendered earlier alleged conduct unrelated to later alleged harassment); *Holmes v. Utah Dep't of Workforce Servs.*, 483 F.3d 1057, 1064 (10th Cir. 2007) (finding plaintiff's office

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 20

**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

departure "separated her from the allegedly hostile work environment").  After Caldwell's transfer, he does not (and cannot) allege that any of his purported harassers from Frederickson followed him to Everett, nor can he claim any relation between the alleged events at Frederickson and the alleged events at Everett.  Rather, it was a "new, new form of Boeing than [he] was used to at Frederickson."  (Caldwell Dep. at 77:4–5.)  As a result, Caldwell's transfer to Everett constitutes an intervening act, and renders his allegations from Frederickson time-barred.

Second, Caldwell's stale allegations from his time at the Everett location are not actionable as part of his hostile-work-environment claim either, because they were sporadic in nature spread over the course of a year, and, regardless, involved different alleged perpetrators.  *See, e.g.*, *Porter*, 419 F.3d at 893 (requiring same actions, same managers, or greater frequency); *Henry*, 37 F. Supp. 3d at 1085–86 (noting "isolated instances of offensive conduct are insufficient to create a triable issue of fact" and collecting cases), *aff'd*, 644 F. App'x 787 (9th Cir. 2016); *Panelli v. First Am. Title Ins. Co.*, 704 F. Supp. 2d 1016, 1030 (D. Nev. 2010) (comments over two-year period not enough (citing *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 992 (C.D. Cal. 2000))); *Stevens v. Cnty. of San Mateo*, No. C 04-02762 SI, 2006 WL 581092, at *5 (N.D. Cal. Mar. 7, 2006) (sporadic and isolated racial comments over two years not enough), *aff'd*, 267 F. App'x 684 (9th Cir. 2008).  The only other purported interactions Caldwell raised while at Everett involved his allegations about Anderson and the basketball court as well as the office administrator and the Sparkletts water cooler, both of which occurred more than half a year before his allegations regarding Hammond and the unnamed tooling department employee.  Given the disparate and distinct nature of those allegations—which all involved different individuals, in different places, involving different issues—Caldwell simply cannot establish that his earlier-in-time Everett allegations were part of the same allegedly unlawful employment practice as his later allegations. *See Rekow v. Sebelius*, No. 10-8156, 2011 WL 1791272, at *3 (D. Ariz. May 11, 2011) (holding incidents not sufficiently related where they differed in character and involved several different

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 21

**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue. N.W.
Washington, DC 20004
+1.202.739.3000

perpetrators).  Because the majority of Caldwell's Everett allegations occur outside of his 300-day window and do not comprise a single unlawful practice, his otherwise untimely allegations cannot support his claim.

### 3.    The Totality of Caldwell's Allegations Still Cannot Create a Hostile Work Environment.

Even if the Court were to consider the entire universe of Caldwell's allegations over his four-year tenure (which, for the reasons explained, it should not), his allegations are still not enough to sustain a hostile-work-environment claim.  Not only do these allegations admittedly have no relation to Caldwell's race in most respects, they are also too spread out to be pervasive and lack the high level of severity required by law.

Caldwell cannot adduce evidence—rather than his own self-serving and speculative statements—that he was subject to this unwelcome conduct because of his race.  To the contrary, nearly all of Caldwell's allegations were everyday workplace grievances.  Most of the allegations from his Complaint are undisputedly race-neutral after discovery.  For one thing, ambiguous language and phrasing is not evidence of racial animus for a hostile work environment.  *See Brown v. Contra Costa Cnty.*, 671 F. App'x 623, 623 (9th Cir. 2016) (affirming district court's grant of summary judgment where "[n]early all of the alleged workplace incidents [were] race neutral, and the record provide[d] no reason to infer that they had anything to do with [plaintiff's] race"); *Baptiste v. LIDS*, 17 F. Supp. 3d 932 (N.D. Cal. 2014) (finding phrases "you people," "dressing ghetto," "lazy," and "thief" to be vague, ambiguous, not suggestive of racial animus, or stray remarks).  And importantly, on summary judgment, claims that amount to mere "conclusory allegations" cannot merit consideration.  *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003).

Thus, although Caldwell has made several conclusory assumptions about the water cooler (not fountain) budgeted to the 787 program, he acknowledges that he has no evidence that the actions of the office administrator were based on his race.  (Caldwell Dep. at 239:17–240:3.)

Indeed, employees who are not African-American received the same instructions as did Caldwell. (Declaration of Allan Koahou ¶¶ 3, 6, 9; Declaration of Robert McNally ¶¶ 3, 6, 7, 9.)  By the same token, Caldwell's alleged encounter with the security officer was facially race-neutral, and Caldwell himself admits that the officer did not say anything that Caldwell believes pointed to his race, or make any derogatory gesture.[10]   (Caldwell Dep. at 212:5–10.)  Had the officer been African-American, Caldwell would "not necessarily" have thought that his actions were racially motivated.  (*Id.* at 213:3–6.)[11]  Last, Caldwell speculates that longstanding Boeing recreation center rules are racially hostile even though he was asked to observe them along with all others. (*See* Declaration of Ron Anderson ("Anderson Decl.") ¶¶ 9, 12.)

To be sure, courts have dismissed hostile-work-environment claims premised on allegations that are far more substantial that those put forward here.[12]  Although Caldwell's

---

[10] Caldwell's uncorroborated allegations regarding the purported stop are "exceptionally unlikely," to wit: Boeing security officers are carefully trained to effect stops with public and employee safety paramount, not in the manner Caldwell describes; a crouched position would only be required by exigent circumstances, which would not be present leaving the facility main gate; a required incident report would have been filed for such an encounter, but no report exists; and the officer would have known Caldwell was a Boeing employee returning to the facility the next work day. (*See* Declaration of Randy Woolard ("Woolard Decl.") ¶ 12.)

[11] Caldwell's suspicions are, again, insufficient for summary judgment.  *See EEOC v. GNLV Corp.*, No. 2:06-CV-01225-RCJ, 2014 WL 7365871, at *33 (D. Nev. Dec. 18, 2014) (entering summary judgment for employer because there was "no evidence other than [plaintiff's] suspicions that the guards' actions of asking for badges were motivated by race," and those suspicions fell "well short of establishing a hostile work environment based on severe or pervasive conduct of a racial nature").

[12] *See, e.g.*, *Dawud*, 2018 WL 4735703, at *6 (finding that "offensive and inappropriate" comments "did not so pollute the workplace that it altered the conditions of [plaintiff's] employment" over seven-year period where comments were made by different people, and were "not pervasive enough to amount to a hostile work environment"); *Mangaliman v. Wash. State DOT*, No. 11-1591 RSM, 2014 WL 1255342, at *10 (W.D. Wash. Mar. 26, 2014) (no hostile work environment where employee was called "dumb Filipino," yelled at by supervisors, "scrutiniz[ed]," and "subject[ed] to extensive performance testing"); *Walker v. Seattle Hous. Auth.*, No. 04-1021JLR, 2005 WL 1126926, at *9 (W.D. Wash. May 11, 2005) (manager's comments that she was "afraid of black women" and that three African-American employees were "out to get us" not hostile work environment); *Hercules v. Dep't of Homeland Sec.*, 2008 WL 1925193 at *20–21 (N.D. Cal. Apr. 29, 2008) (supervisor's use of "bitch" and "nigger" on two separate occasions, possibly directed at plaintiff, and making derogatory comments before plaintiff's co-workers, to the effect that plaintiff was "not going anywhere," was "not going to do anything," and would never be promoted, held insufficient); *Stevens*, 2006 WL 581092 at *5–6 (isolated and sporadic age- and race-based comments directed at plaintiff, such as "stupid old man," "old barking dog," "old gangster," and "you're my nigger" insufficiently severe or pervasive); *see also Manatt*, 339 F.3d at 795–803 (affirming dismissal of hostile-work-environment claim where plaintiff alleged racially offensive statements, pantomimes, and gestures); *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1033–35 (8th Cir. 2006) (supervisor's ill-advised attempts at racial humor—including the use of "boy," "what's up my nigga?," "slave driver," and "lawn jockey"—insufficient); *Patt v. Family Health Sys.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight offensive gender-related comments "too isolated and sporadic").

---

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 23

1  allegations of stray remarks and gestures may be offensive, they are fewer in number, frequency,

2  and severity than the legal bar.  And Caldwell stated in his deposition that he has no evidence the

3  alleged water cooler incident related to his race.  (Caldwell Dep. 239:25–240:3.)  What is more,

4  Caldwell's allegation of a truck with the Confederate flag at Frederickson is also insufficient to

5  support his claim, even in conjunction with his other, uncorroborated allegations.  *See, e.g.*, *Devers*

6  *v. SNC-Lavalin Generation, Inc.*, No. 12 CV 3747 RJD CLP, 2014 WL 4954623, at *5 (E.D.N.Y.

7  Sept. 30, 2014) (finding "presence of three Confederate flag stickers at a worksite" insufficient,

8  "even in conjunction with" racially "insensitive remarks"); *Ellis v. CCA of Tenn., LLC*, 650 F.3d

9  640, 648 (7th Cir. 2011) (finding stray comments of  "monkey" and two incidents of employee

10  wearing Confederate flag insufficient to maintain claim); *Jones v. Motorola, Inc.*, No. 00 C 6439,

11  2001 WL 864273, at *5 (N.D. Ill. July 30, 2001) (employee comments, race-related scribbling, a

12  Confederate flag placed on top of building, and Confederate flag decal stuck on plaintiff's

13  nameplate not enough over multiyear period).

14       Although the Court was required to construe Caldwell's unsupported allegations in his

15  favor at the pleading stage, Caldwell must now come forward with specific and substantiated

16  evidence.  Caldwell does not and cannot satisfy that burden, and the Court should enter summary

17  judgment in Boeing's favor on Caldwell's hostile-work-environment claim.

18  **IV.**     **<u>CONCLUSION</u>**

19       Boeing respectfully requests that the Court grant its motion, dismiss Caldwell's remaining

20  claims in their entirety with prejudice, and enter judgment in Boeing's favor.

21

22

23

24

25

26

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 24

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000

DATED: January 22, 2019   **MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Allison N. Powers*

Lincoln O. Bisbee, admitted pro hac vice
Zachary S. Stinson, admitted pro hac vice
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 739-3000
Fax: (202) 739-3001
Email: lincoln.bisbee@morganlewis.com
Email: zachary.stinson@morganlewis.com

Allison Powers, admitted pro hac vice
77 West Wacker Drive
Chicago, Illinois 60601
Phone: (312) 324-1000
Fax: (312) 324-1001
Email: allison.powers@morganlewis.com

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*/s/ Laurence A. Shapero*

Laurence A. Shapero, WSBA #31301
1201 Third Avenue, Suite 5150
Seattle, WA 98101
Phone: (206) 876-5301
Fax: (206) 693-7058
Email: laurence.shapero@ogletree.com

*Attorneys for Defendant*
THE BOEING COMPANY

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 25

**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue. N.W.
Washington, DC 20004
+1.202.739.3000

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which caused a copy of the same to be served via ECF on January 22, 2019, upon:

Reba Weiss
WEISS LAW FIRM, PLLC
12537 15th Ave NE, Suite 108
Seattle, WA 98125-3979
Phone: (206) 508-5933
reba@weisslawfirm.org

Steven H. Haney
Gregory L. Young
HANEY & YOUNG LLP
1055 West Seventh Street, Suite 1950
Los Angeles, CA 90017
Phone: (213) 228-6500
Fax: (213) 228-6501
shaney@haneyyoung.com
gyoung@haneyyoung.com

*Attorneys for Plaintiff Brett Caldwell*

*/s/ Allison N. Powers*
Allison N. Powers (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
Phone: (312) 324-1000
Fax: (312) 324-1001
Email: allison.powers@morganlewis.com

*Counsel for Defendant The Boeing Company*

DEFENDANT THE BOEING COMPANY'S
MOTION FOR SUMMARY JUDGMENT (No. 17-1741 JLR) - 26

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
+1.202.739.3000