THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BRETT CALDWELL, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE BOEING COMPANY, a Delaware Corporation and DOES 1-10;<br><br>                    Defendants. | Case No. 2:17-cv-01741-JLR<br><br>**1.    MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; AND**<br><br>**2.    DECLARATIONS OF BRENT CALDWELL AND STEVEN H. HANEY IN SUPPORT THEREOF**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Noting Date:      February 15, 2019<br>Trial Date: |

**TO THIS HONORABLE COURT, THE PARTIES, AND THEIR COUNSEL OF RECORD:**

Plaintiff Brett Caldwell ("Plaintiff") hereby opposes the motion for Summary Judgement filed by Defendant the Boeing Company ("Defendant").

**HANEY & YOUNG, LLP**

/s/Steven H. Haney

Attorney for Plaintiff (admitted pro hac vice)
1055 w. 7TH Street, Suite 1950
Los Angeles, CA 90017
(213) 228-6500
shaney@haneyyoung.com

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      Introductory Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      Individuals Whose Testimony is Cited Herein . . . . . . . . . . . . . . . . . . . . . . 1

II.     STATEMENT OF DISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Summary Adjudication Should be Denied as to Caldwell's Race

                Discrimination Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                1.      Plaintiff Can Establish A Prima Facie Case Of Discrimination  . . . . . . . 15

                        a.      Plaintiff is in a Protected Class  . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        b.      Plaintiff Produced Evidence He

                                Performed Competently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        c.      Circumstantial Evidence Can Demonstrate

                                Discriminatory Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                i.      Non-African Americans Treated More Favorably . . . . . . . . . . . . . . . . . 16

                ii.     Similarly Situated Personnel Not Treated the Same as Plaintiff . . . . . . 17

                        d.      Plaintiff Suffered an Adverse Employment Action . . . . . . . . . . . 18

                2.      The Burden Shifts Bact to Boeing to Demonstrate

                        Non-Discriminatory Reason . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                3.      Plaintiff Can Demonstrate Significant Evidence of Pretext . . . . . . . . . . . 18

                1.      Statute of Limitations - Race Discrimination  . . . . . . . . . . . . . . . . . . . . . . 20

                2.      Caldwell Was Subject to Adverse Action - Race Discrimination . . . . . . 22

                3.      Can Show That Adverse Actions Were Taken Against Him Because of

                        Race - Race Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          4.      Boeing Did Not Act with Legitimate, Nondiscriminatory Reasons. Caldwell
                  has Established Pretext. - Race Discrimination . . . . . . . . . . . . . . . . . . . . 23

      C.      Caldwell Has Shown Racial Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**TABLE OF AUTHORITIES**

*Board of Trustees of Keene State College v. Sweeney* (1978) 439 U.S. 24, 24   . . 18

*Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 1999).   . . . . . . . . . . . . . 22

*Damon v. Fleming Supermarkets of Florida, Inc.* (11th Cir. 1999) 196 F.3d 1354, 1363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*EEOC v. Ethan Allen, Inc.* (2d Cir. 1994) 44 F.3d 116, 120 . . . . . . . . . . . . . . . . . 19

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998 . . . . . . . . . . . . 14

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hawn v. Executive Jet Mgmt.* (9th Cir. 2010) 615 F.3d 1151, 1157-1158 . . . . . . . 19

*McDonald v. Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273, 280 . . . . . . . . . . . . . . . . . 17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973 . . . . . . . . . . 14, 15, 19

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 112 S. Ct. 2061 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

*O'Regan v. Arbitration Forums, Inc.* (7th Cir. 2001) 246 F.3d 975, 983 . . . . . . . . 19

*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 143 . . . . . . . . 18

*Roby v. Mckesson Corp.* (2009) 47 Cal. 4th 686 . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Shinde v. Coffman Eng'rs, Inc.*, 584 F. App'x 398 (9th Cir. 2014) . . . . . . . . . . . . 23

*Strong v. Merrill Lynch*, 470 F. App'x 672, 673 (9th Cir. 2012). . . . . . . . . . . . . . . 23

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) . . 14, 15, 18

**STATUTES**

Title VII of the Civil Rights Act, ........................................ 13, 20

42 U.S.C. § 2000e-5(e)(1). ............................................. 21

**OTHER AUTHORITIES**

1 B. Lindemann & P. Grossman, Employment
Discrimination Law 348-349 (3d ed. 1996) .............................. 20

1        <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2 **I.**    **INTRODUCTION**

3     **A.**    **Introductory Statement**

4      Plaintiff, Brett Caldwell ("Caldwell" or "Plaintiff") is a 36 year-old, highly

5 educated, African American male, military veteran who suffered intense racial

6 harassment and racially motivated adverse employment actions during his tenure

7 with Boeing and was ultimately terminated because of his race, for the exact same

8 conduct participated in by all Boeing employees at the Everett facility, and which

9 did not violate any of Boeing's rules, yet one of the very, very few African-

10 American employees was terminated while none of the non-African American

11 Employees received any discipline whatsoever.

12     **B.**    **Individuals Whose Testimony is Cited Herein**

13        **1.**    **Dean Bogardus**

14      Dean Bogardus ("Bogardus") is a Boeing manager, Plaintiff's supervisor from

15 2015 through Plaintiff's termination, has been employed with Boeing since 2011 at

16 its Everett, Washington facility.  (Deposition of Dean Bogardus, Corporate Designee

17 "Bogardus Corp. Depo." 12:1-17).  Bogardus testified twice, once in his individual

18 capacity and once as Boeing's Corporate Designee as Person Most Knowledgeable.

19        **2.**    **Brian J. Nino**

20      Brian J. Nino is a former of co-worker of Plaintiff's in the same department at

21 Boeing, at which time he personally witnessed the occurrences to which he testifies.

22 (Deposition of Brian J. Nino "Nino Depo." 7:16-21).

23        **3.**    **Larry Nguyen**

24      Larry Nguyen is a CTLM Operator and formerly a composite fabricator at

25 Boeing, who worked with Plaintiff at both the Fredericksburg and Everett facilities,

26 And, for a time, occupied the next cubicle to that of Plaintiff.  (Deposition of Larry

27 Nguyen "Nguyen Depo." 17:1-3; 17:21-18:9; 18:15-17; 19:16-19; 21:16-22:22;

28 23:13-24:10; 25:11-24).

#### 4.   Booker T. Washington

Booker T. Washington is a former co-worker of Plaintiff's at Boeing. (Deposition of Booker T. Washington "Washington Depo." 21:3-22:2).

#### 5.   Logan Schimon

Logan Schimon is a former co-worker of Plaintiff at Boeing.  (Deposition of Logan Schimon "Schimon Depo." 10:10-20; 11:3-19).

#### 6.   Thomas Hammond

Thomas Hammond was Plaintiff's lead at Boeing from 2016, on at the Everett facility.  (Deposition of Thomas Hammond "Hammond Depo." 9:20-10:16; 10:21-11:4).

#### 7.   Derrick Yann

Derrick Yann was a co-worker of Plaintiff, who has worked for Boeing since 2012, as a Quality Assurance Inspector, and who worked with Plaintiff at the Everett Facility.  (Deposition of Derrick Yann "Yann Depo." 11:25-12:4; 12:13-13:14).

#### 8.   Plaintiff, Brett Caldwell

Plaintiff, who is described in detail, hereinbelow, testifies via declaration in support of this opposition.

## II.   STATEMENT OF DISPUTED FACTS

Plaintiff Brett Caldwell ("Plaintiff" or "Caldwell") is a 36 years old African American male. Caldwell tends to stand out from many of his peers because, among other things, he is 6'8" tall. (Declaration of Brett Caldwell ("Caldwell Decl.") ¶ 2). Before Boeing, Caldwell served eight years in the United States Navy, including four years in active duty and four years in active reserves during which he was included in combat for our country. Caldwell Decl. ¶ 2.  Caldwell ultimately received an Honorable discharge. Caldwell Decl. ¶ 2.  Caldwell has a Bachelor's of Science degree in Molecular Cell Biology from University of Hawaii. He has never been a party of a lawsuit before this case. Caldwell Decl. ¶ 2. His manager at Boeing, Dean Bogardus, described Caldwell as a "good worker" who was so skilled

1  that he trained other Boeing employees (Bogardus, individual depo, page 7:13-25;

2  see also Nguyen, 39:5-10 and Hammond, p. 10:21-11:4, who was Caldwell's "Lead"

3  but admitted Caldwell was more proficient at running the relevant machine than he

4  was).

5       Caldwell began working for Boeing on January 13, 2013, as a Composite

6  Fabricator. (Caldwell Decl. ¶ 3)  He initially worked at Boeing's location in

7  Frederickson, Washington. (Caldwell Decl. ¶ 3) He worked in that position until he

8  was promoted from a Level 4 to a level 6 with a new job entitled CTLM Operator,

9  which later changed to AFP Operator although CTLM Operators and AFP Operators

10  perform the same function. (Caldwell Decl. ¶ 3)  He worked at Frederickson through

11  approximately November, 2015, at which time HE left for an opportunity and to get

12  away from the toxic work environment to work at Boeing's 777X program in

13  Everett, Washington. (Caldwell Decl. ¶ 3)  While in retrospect he was naive, and

14  believed the change of venue might improve the racial harassment and

15  discrimination he suffered at Frederickson. (Caldwell Decl. ¶ 3) Unfortunately,

16  Caldwell was wrong. (Caldwell Decl. ¶ 3)  The racially discriminatory and harassing

17  conduct against him continued. (Caldwell Decl. ¶ 3); (Washington Depo.68:9-69:2).

18       While at the Boeing location in Frederickson, Caldwell suffered continuous,

19  almost daily racial harassment and discrimination due to his race.  (Caldwell Decl. ¶

20  4; Nino Depo. 42:22-46:4; 46:9-23; 48:8-11; 48:23-49:7; 49:22-50:12; 62:12-25;

21  63:1-18); (Deposition of Booker T. Washington "Washington Depo." 48:19-50:12;

22  54:16-55:3; 68:9-69:2); (Nguyen Depo. 26:12-18); (Schimon Depo. 27:9-28:1; 28:4-

23  7);  That conduct included, for example:

24       a.    In, or around March, 2015, a Caucasian female manager named Colleen

25  Peterson acting surprised and making a big deal out of the fact that Caldwell was

26  doing calculus work, with the implication being that an African American male

27  would not be smart enough to do calculus. Colleen never acted surprised when

28  Boeing's Caucasian employees did their calculus work. (Caldwell Decl. ¶ 4).

1    b.    In, or around, August, 2014, Boeing falsely accused Caldwell (by third

2  shift Caucasian team leader Jeff) of putting razorblades under other people's work

3  orders to cause them harm – an accusation that was never made to any Caucasian

4  Boeing employees (Caldwell Decl. ¶ 4). Jeff also falsely accused Caldwell of going

5  too deep into the piles (of component parts) for parts he was not even working on.

6  (Caldwell Decl. ¶ 4).

7    c.    In, or around, January, 2015, Colleen Peterson also falsely chastised

8  Caldwell for improperly throwing away fiberglass due to Jeff's false accusations.

9  (Caldwell Decl. ¶ 4).  During Colleen's rant, she made fun of how little Caldwell

10  was paid at Boeing; it was later proven that a Caucasian male employee had thrown

11  away the fiberglass. (Caldwell Decl. ¶ 4).  When the true culprit was found,

12  Caldwell received no apology for being falsely accused. Colleen did ask Caldwell if

13  he thought the accusation against me was racially motivated, to which he replied,

14  "Absolutely." (Caldwell Decl. ¶ 4).

15    d.    While at Frederickson, in, or around, May, 2014, a Caucasian male

16  Boeing employee with a pickup truck that had a Confederate flag flying on his

17  vehicle on display went out of his way to park right next to Caldwell's vehicle at

18  work each day. (Caldwell Decl. ¶ 4).  This upset Caldwell very much. The Boeing

19  employee was obviously racially taunting Caldwell. (Caldwell Decl. ¶ 4).  A

20  different Caucasian Boeing employee wore Confederate flag memorabilia to work at

21  Everett around October, 2016. Even after Caldwell complained to Boeing

22  management, the individual moved the Confederate flag so it was no longer flapping

23  in the wind, but instead rolled it up on his roll but on his truck so it was still visible.

24  (Caldwell Decl., ¶ 4(d); see also photo of Confederate flag, Haney Decl., ¶ 3,

25  Exhibit 2 (h)).

26    Even more troubling was the conduct of Ron Jarvis, a Caucasian Boeing

27  manager who would talk to Caldwell in a faux black voice and, among other things,

28  call Caldwell a "Nigga", "Slick", "Homeboy", and say things like "Yo, yo, yo, yo,

1   yo" to Caldwell in his black accented voice. (Caldwell Decl. ¶ 5). Having a

2   Caucasian manager calling Caldwell his "Nigga" was shocking and deeply

3   disturbing to Caldwell. This took place continuously from February, 2013 until

4   Jarvis left in the Fall of 2015. (Caldwell Decl. ¶ 5); (Deposition of Brian J. Nino

5   "Nino Depo." 42:22-46:4; 46:9-23; 48:8-11; 48:23-49:7).

6       Also, on April 9, 2013, at Frederickson, a non-African American employee

7   named Joey tried to pick a fight with Caldwell. (Caldwell Decl. ¶ 6). Although

8   Caldwell reported Joey's misconduct to management, nothing was done to Joey.

9   (Caldwell Decl. ¶ 6). Caldwell is confident based on his knowledge of Boeing's

10  managers that if he had tried to pick a fight with a non-African American, Caldwell

11  would have been terminated on the spot. (Caldwell Decl. ¶ 6).

12      While at both Boeing's Frederickson facility, in October, 2015, and later at

13  the Everett facility, Caldwell played R&B music in his work area on multiple

14  occasions and was accused by Caucasian employees and managers of playing

15  "aggressive" music. (Caldwell Decl. ¶ 7). How Diana Ross or Aretha Franklin are

16  aggressive was beyond Caldwell, and he strongly believes any music he played as

17  one of the only African American males at Everett would have been criticized by

18  Caucasian management. (Caldwell Decl. ¶ 7); (Nino Depo. 49:22-50:12).

19      From February, 2013, through June, 2014, when Caucasian manager Ron

20  Jarvis was not calling Caldwell his "Nigga" or speaking to Caldwell in his "black"

21  voice, he would sneak around Caldwell and peek at him in an effort to see what

22  Caldwell was doing. (Caldwell Decl. ¶ 8); (Nino Depo. 62:12-25; 63:2-18).

23  Although Caldwell worked with Mr. Jarvis for a long period of time, he never saw

24  him "spying" on any of the Caucasian employees in Frederickson. (Caldwell Decl.

25  ¶ 8).

26      Caldwell played basketball at the Boeing Frederickson gym, which was

27  located in a remote area of Boeing. (Caldwell Decl. ¶ 9). From April, 2013,

28  through November, 2015, a Caucasian AGV Operator went out of his way to park

1   his AGV in front of Caldwell, effectively blocking him in, when there were other

2   areas the Operator could have parked. (Caldwell Decl. ¶ 9).  When Caldwell

3   complained to the Operator about following him around, other Caucasian AGV

4   Operators began to park at the remote locations so Caldwell alternately could not

5   play basketball on his lunch hour.  (Caldwell Decl. ¶ 9).

6          On one occasion at Frederickson, someone took Caldwell's car keys from his

7   desk. (Caldwell Decl. ¶ 10).  Caldwell could not find his keys for four hours.

8   Caldwell later found that someone had symbolically placed them in the back seat of

9   his car, which caused Caldwell to think back to Rosa Parks being told to sit in the

10  back of the bus.  (Caldwell Decl. ¶ 10).

11         The racial harassment did not stop when Caldwell moved to Boeing, Everett,

12  but continued to be inflicted on him by Boeing and its managers on an ongoing,

13  continuous and daily basis. (Caldwell Decl. ¶ 11); (Washington Depo. 68:9-69:2).

14  On one occasion, in early 2017, a Caucasian woman watched Caucasian Boeing

15  employees, who were in front of Caldwell in line, drink from a water cooler.

16  (Caldwell Decl. ¶ 11).  When Caldwell got to the cooler, she intervened and

17  screamed at Caldwell that the water cooler was not for him.  (Caldwell Decl. ¶ 11).

18  Caldwell was stunned. Segregated water coolers in 2017?  Caldwell reported this

19  conduct to his manager at Everett, Dean Bogardus, who was Caucasian, did nothing.

20  Bogardus also never claimed at the time that he, too, was prevented from using that

21  water cooler, which he later testified to.  (Caldwell Decl. ¶ 11); (Nguyen Depo.

22  26:12-18).

23         There was also a series of basketball-related racial harassment perpetrated by

24  a Caucasian Boeing employee named Ron Anderson ("Anderson"), all of which

25  were reported to Mr. Bogardus, who took no action on Caldwell's behalf. These

26  incidents include:

27         a.     In December, 2015, Anderson falsely accused Caldwell of stealing the

28  basketballs which were Caldwell's own basketballs. (Caldwell Decl. ¶ 12).  The

Boeing basketballs were easily distinguishable from Caldwell's basketballs because Boeing had their name burned on the basketballs. (Caldwell Decl. ¶ 12). When Caldwell pointed out the allegedly stolen basketballs belonged to him, Anderson said that the sign had a rule on it that said Boeing employees could not bring their own basketballs. (Caldwell Decl. ¶ 12). Anderson and Caldwell walked over to the sign and there was nothing on the sign saying you could not bring your own basketballs. (Caldwell Decl. ¶ 12). A few weeks later, they changed the sign to add that you can't bring your own basketballs to the court. (Caldwell Decl. ¶ 12).

   b.     Being 6'8", Caldwell can dunk a basketball with ease. (Caldwell Decl. ¶ 12). On or around February 13, 2016, he played in a game and dunked a couple of times. (Caldwell Decl. ¶ 12). Anderson told Caldwell there was no dunking allowed. (Caldwell Decl. ¶ 12). Caldwell looked at the sign of rules and the sign said nothing about dunking. (Caldwell Decl. ¶ 12). When Caldwell pointed that out to Anderson, shortly thereafter, they changed the sign to add a "no dunking rule." (Caldwell Decl. ¶ 12). Caldwell felt this "rule" racially targeted him because the other players were Caucasian, and Caldwell never saw one of them who could dunk. (Caldwell Decl. ¶ 12). When Caldwell emailed his manager about the racial profiling, his manager never responded. (Caldwell Decl. ¶ 12).

   c.     On February 19, 2016,  at the Everett gym, Caldwell missed a free throw and said a curse word. (Caldwell Decl. ¶ 12). The gym was full, and a half court pickup game was going on at the other side of the court. (Caldwell Decl. ¶ 12). Caldwell heard Caucasian players in the pickup game using swear words, but Anderson did not seem interested in them. (Caldwell Decl. ¶ 12). Caldwell did not say the word very loudly and the gym was very noisy. (Caldwell Decl. ¶ 12). For Anderson to hear him, he stood as close to Caldwell as possible, which he did not do to any of the other players in the gym, all of whom were Caucasian. (Caldwell Decl. ¶ 12). Anderson approached Caldwell and told him not to cuss. (Caldwell Decl. ¶ 12); (Deposition of Booker T. Washington "Washington Depo." 48:19-50:12).

1    Caldwell promptly apologized and went back to shooting free throws. (Caldwell

2    Decl. ¶ 12).  Anderson then walked on the court and stood right next to Caldwell for

3    a couple of minutes with his arms folded. (Caldwell Decl. ¶ 12).  At some point,

4    Anderson said he did not like Caldwell's attitude. Anderson then began screaming at

5    Caldwell and ordered him to leave the gym. (Caldwell Decl. ¶ 12); (Washington

6    Depo. 50:19-53:8).  Caldwell retrieved his belongings and as he tried to exit,

7    Anderson blocked the door and said he was going to call the police. (Caldwell Decl.

8    ¶ 12); (Washington Depo. 54:16-55:3).  Caldwell thought he must be kidding – but

9    Anderson actually did call Boeing security. Boeing security sided with Anderson

10    and asked Caldwell for his badge to prove he worked at Boeing. (Caldwell Decl. ¶

11    12); (Washington Depo. 52:2-10).

12      Caldwell believed this was racial targeting because he recognized the security

13    guards and he is certain they knew who he was. (Caldwell Decl. ¶ 12).  There were

14    no other 6'8" African American males, and hardly any African American males of

15    any height, at Boeing.  (Caldwell Decl. ¶ 12).  Nevertheless, Caldwell showed them

16    his badge. Boeing security really only let Anderson give his version of what

17    happened. Caldwell emailed his manager hoping he would talk to Anderson.

18    (Caldwell Decl. ¶ 12).  Bogardus' initial reaction to the story was "this is crazy"

19    meaning Anderson overreacted. (Caldwell Decl. ¶ 12).  But shortly after that,

20    Bogardus disciplined Caldwell by giving him a Corrective Action Memo ("CAM").

21    That is when Caldwell knew his days at Boeing were numbered. (Caldwell Decl. ¶

22    12).  Singling out the black man for saying one cuss word while playing a sport

23    when there was a gym full of Caucasians doing the same thing reeked of

24    discrimination and told Caldwell that Boeing wanted him out of there.  (Caldwell

25    Decl. ¶ 12); (Washington Depo. 58:22-59:16)

26      Another incident, in November, 2015, involved a Caucasian Boeing employee

27    named Ms. Connie, with whom Caldwell worked and knew well.  (Caldwell Decl. ¶

28    13).  Caldwell saw her in a tunnel at Boeing and waved to her. (Caldwell Decl. ¶

1  13).  She did not wave back but instead look at her feet. (Caldwell Decl. ¶ 13).

2  Caldwell went down the tunnel to clean up after work. (Caldwell Decl. ¶ 13).  The

3  next thing he knew, two Caucasian Boeing security guards told Caldwell to "step

4  outside".  Caldwell has no doubt that a Caucasian employee would not have been

5  dragged out of the locker room for waving to a white female co-worker.  (Caldwell

6  Decl. ¶ 13).

7  Perhaps one of the worst incidents of racial harassment that occurred at

8  Everett included Caucasian employees in the Tooling Department on December 1,

9  2016.  (Caldwell Decl. ¶ 14).  Caldwell was moving seven foot long pieces of metal.

10  (Caldwell Decl. ¶ 14).  As he was doing so, Caldwell walked by two or three

11  Caucasian Boeing employees. (Caldwell Decl. ¶ 14).  One of them began walking as

12  if he were a knuckle-dragging ape and making ape noises. (Caldwell Decl. ¶ 14).

13  The other Caucasian Boeing employees laughed aloud. (Caldwell Decl. ¶ 14).

14  When Caldwell asked the man why he was mocking him, he said, "I can't stand you

15  blacks." (Caldwell Decl. ¶ 14).  Caldwell promptly notified his manager, Dean

16  Bogardus, who later came to Caldwell and accused him of trying to provoke a fight

17  in the parking lot, which he did not.  (Caldwell Decl. ¶ 14).  In fact, the "fight in the

18  parking lot story" was fabricated from whole cloth. (Caldwell Decl. ¶ 14).  Bogardus

19  even threatened to discipline Caldwell!  Ultimately, no action was taken against the

20  racial harasser.  (Caldwell Decl. ¶ 14).  Caldwell reported this and many of the other

21  incidents both to his manager, who did nothing, but also to Human Resources, who

22  unfortunately also did nothing.  (Caldwell Decl. ¶ 15).

23  While both at Frederickson and continuing at Everett until his termination,

24  Boeing security guards harassed Caldwell.  (Caldwell Decl. ¶ 16).  Although he

25  parked in close proximity to the guard shack and always said hello to the guards,

26  they acted like they did not know Caldwell worked at Boeing.  (Caldwell Decl. ¶

27  16).  On one occasion, in June, 2013, Caldwell was pulled over by Boeing security

28  with lights blaring and the guards unlatching their holsters and placing their hand on

1   their guns as Caldwell exited the vehicle. (Caldwell Decl. ¶ 16).  They also always

2   asked Caldwell for his badge, even though Caldwell knew they knew he worked at

3   Boeing. (Caldwell Decl. ¶ 16).  Caldwell never saw the guards treat any Caucasians

4   as if they were criminals – which is exactly how they treated Caldwell at both of the

5   locations at which he worked at Boeing.  (Caldwell Decl. ¶ 16).

6       Similarly, at both the Frederickson and Everett Boeing facilities up to the date

7   of his termination, Caucasian employees, managers, and security guards consistently

8   asked me to show his Boeing badges, as if they could not believe that an African

9   American male should be on the premises. (Caldwell Decl. ¶ 16).  This conduct

10  continued up through the date of his termination. (Caldwell Decl. ¶ 16).  Caldwell

11  believes he was targeted because of his race, and he neither saw nor heard of any

12  Boeing Caucasian employee who was asked to show his or her badge on a regular

13  basis (Caldwell Decl., ¶ 16).

14      Caldwell was the only one at Frederickson who had his food stolen out of his

15  work area and the refrigerator. (Caldwell Decl. ¶ 17).  This happened more than

16  once, including in 2014. Caldwell knows that the theft of his food was based on

17  racial animosity as no Caucasian had the same problem at Frederickson in 2014.

18  (Caldwell Decl. ¶ 17).

19      From April, 2016, through his termination, Caldwell was also singled out and

20  harassed on almost a daily basis about his choice of footwear. (Caldwell Decl. ¶ 18).

21  At some point at Everett, a rule was instituted that workers needed to wear footwear

22  with reinforced toes.  (Caldwell Decl. ¶ 18).  Caldwell then bought a pair of royal

23  blue Timberland boots that had reinforced steel toes. (Caldwell Decl. ¶ 18).

24  Although the footwear was in compliance with the Boeing policy, the Caucasian

25  employees and managers constantly questioned Caldwell about and even made fun

26  of his boots.  (Caldwell Decl. ¶ 18).  He was never disciplined for his shoes, which

27  he believes confirms that they met Boeing standards, but the concept of an African

28  American wearing blue boots was just too much for many of the Boeing Caucasians

to take. (Caldwell Decl. ¶ 18).  There was even one instance on which Caldwell was challenged on his boots while he was standing next to a Boeing programmer who was wearing what were obviously non-compliant tennis shoes. (Caldwell Decl. ¶ 18).  Not one person said a word about the Caucasian guy in the non-conforming tennis shoes, but the subject of Caldwell's blue boots was a constant source of derogatory comments from the Caucasian employees and managers of Boeing.[1] (Caldwell Decl. ¶ 18); (Nino Depo. 55:1-56:8).

At some point at Everett, Boeing made Tom Hammond Caldwell's lead.  Mr. Hammond promptly used his newfound authority to boss Caldwell around. (Caldwell Decl. ¶ 19).  He would follow him so closely that sometimes Caldwell had to ask him to please back off and give him some space. On more than one occasion, he told Caldwell privately that he was afraid of Caldwell because that is how he was raised (to fear African-Americans). (Caldwell Decl. ¶ 19).  On one occasion, in October, 2016, Caldwell took Logan Schimon with him to witness Hammond's racist statement. (Caldwell Decl. ¶ 19).  Once again, Hammond said even in Schimon's presence that he was afraid of Caldwell because of how he was raised. (Caldwell Decl. ¶ 19); (Deposition of Logan Schimon "Schimon Depo." 19:25-20:16).  The clear implication is that he feared African American males. (Caldwell Decl. ¶ 19); (Schimon Depo. 19:25-20:16).  Obviously, during his deposition, Hammond denied making such a statement, creating a disputed issue of material fact. (Hammond Depo 17:15-18:9).  Fortunately, Logan Schimon told the truth at his deposition that Mr. Hammond did, in fact, make this statement in their presence. (Caldwell Decl. ¶ 19); (Schimon Depo. 19:25-20:16). From June, 2016, through Caldwell's termination, Mr. Bogardus tried several times to have a Caucasian manager named Mr. Durko talk Caldwell into moving to 2nd shift. (Deposition of

---

[1] An African-American Third Party Witness Booker T. Washington testified he was racially harassed at Boeing's Auburn facility by Caucasian employees and managers over his boots in the same exact manner (Washington Depo, 17:10-18:22)

Dean Bogardus as an individual "Bogardus Individual Deposition" 19:25-20:15).

Caldwell believes Bogardus did this to rid himself of his "black problem," as

Caldwell was essentially the only African-American male at the Everett facility.

Although Caldwell made it clear that he desired to stay on first shift, both Durko and

Bogardus tried to convince him to work the night shift.  (Bogardus Individual

Deposition 19:25-20:15).  Once it became clear that Caldwell would not agree to

leave first shift, Boeing management decided to run him out of Everett.  (Caldwell

Decl. ¶ 20).

   Mr. Bogardus often would say derogatory things about African Americans.

(Caldwell Decl. ¶ 21).  In February, 2017, he came up to Caldwell and told him that

the "blacks" in the South had a "meth problem" and they can't help it.  (Caldwell

Decl. ¶ 21).  Caldwell was stunned as to why Bogardus would go out of his way to

generalize all African Americans from the South as having a drug problem.

Caldwell found it harassing for Bogardus to make such a statement.  (Caldwell Decl.

¶ 21).

   There was never any policy at Boeing, Everett that prevented the employees

from using the Internet when they had down time. (Caldwell Decl. ¶ 22); (Nguyen

Depo. 40:6-14; 40:17-41:17; 41:19-24); (Schimon Depo. 26:14-28:7); (Yann Depo.

17:14-18:4).  Because Boeing, Everett was still being built, and the AFP machines

had to be installed which took a long period of time, the employees at Everett had a

lot of down time (Bogardus Corp. depo., p. 45:6-12; Yann, p. 38:10-39:15 (There

was so much downtime that Boeing employees were using the Internet on personal

matters "half" of the time at work); Hammond depo, p. 27:9-28:4).  Nevertheless,

when Boeing decided they wanted Caldwell out of Everett, they used the excuse that

Caldwell was on the Internet during downtime.  (Caldwell Decl. ℙ 22).

   Notably, no non-African Americans were ever disciplined for this "offense,"

and all of the Boeing employees at Everett used the Internet during down time.

(Caldwell Decl. ¶ 22); (Schimon Depo. 26:14-28:7); (Nguyen Depo. 40:6-14; 40:17-41:17; 41:19-24); (Yann Depo. 17:14-18; 17:20-18:4). Boeing's attempt to use this excuse is a pretext for why Caldwell was really terminated, which is that an almost exclusively non-African company decided to get rid of their so-called "black problem" and hope there would not be repercussions because they knew that Caldwell is, by nature, a nice guy who tries to get along. (Caldwell Decl. ¶ 22).

Boeing's supposed reason for Caldwell's termination is further inexplicable given the fact that Caldwell's manager, Dean Bogardus testified that Caldwell should never have been terminated at all.  (Bogardus Corp. Depo., 23:4-23)

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, the court must "view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).

### B.   Summary Adjudication Should Be Denied as to Caldwell's Race Discrimination Claim

It is unlawful under federal and state laws to discriminate against employees on the basis of race or color as to any employment actions, such as hiring, firing, providing compensation, providing job assignments, offering fringe benefits, or imposing any other term or condition of employment. The primary federal statute prohibiting race discrimination is Title VII of the Civil Rights Act, which is codified at 42 U.S.C. § 2000e, et seq., and prohibits employment discrimination on the basis of several named characteristics.  A plaintiff can establish his or her prima facie case

of race discrimination by providing direct evidence that employment decisions were based on an impermissible criterion *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Caldwell has done so here, providing evidence that his termination was based on his race (Nino Depo. 32:6-33:14); (Caldwell Decl. ¶¶ 3, 11, 19, 21, 22). Plaintiff has provided direct evidence which is evidence that is without inference or presumption. See, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

A plaintiff can also establish his or her prima facie case of race discrimination by establishing that (1) he is a member of a protected class; (2) he was performing competently in the position he held; (3) he suffered an adverse job action; and (4) some other circumstances suggest a discriminatory motive. See *McDonnell v. Green*, *supra*, at 802. Here, the evidence establishes a prima facie case using the McDonnell Douglas test. Notably, establishing a prima facie case is "not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It is not disputed that as an African American, Caldwell is a member of a protected class; there is ample evidence that Caldwell is a competent employee; Caldwell clearly suffered adverse job actions, including, but not limited to, a corrective action memo ("CAM") for conduct that Caucasian employees engage in on a regular basis with no consequences and later was terminated for conduct that other non-African Americans engaged in without discipline or repercussions.  (Caldwell Decl. ¶ 22); (Schimon Depo. 27:9-28:1; 28:4-7); (Nguyen Depo. 40:6-14; 40:17-41:17; 41:19-48:13).  In addition, Caldwell's manager, Dean Bogardus testified that Caldwell should never have been terminated at all.  (Bogardus Corp. Depo. 23:4-23).

Thus, Caldwell can establish, both by direct evidence, and by the McDonnell Douglas test, that he has suffered adverse employment actions based on disparate treatment. Among other things, Plaintiff was called "Nigga" and "Slick" and "Homeboy" by a Caucasian Boeing manager using a faux African American voice

(Caldwell Decl. ¶¶5 & 8); (Nino Depo. 43:4-46:1; 46:14-47:5), not being allowed to drink from a Boeing watercooler because he is black, having a Boeing employee park next to him every day with a Confederate flag on the Caucasian employee's truck, being told by a Boeing employee "I can't stand you blacks", or that individuals walked around in front of Plaintiff like an ape, have long been recognized as racial harassment. See, e.g., *Roby v. Mckesson Corp.* (2009) 47 Cal. 4th 686. In short, there can be no other inference than these actions were racially motivated. Accordingly, Caldwell has met the *McDonnell Douglas Test*, as well, and has established his prima facie case.

### 1. Plaintiff Can Establish A Prima Facie Case Of Discrimination

Courts employ at trial the three-stage test that was established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 to resolve discrimination claims. At trial, the employee must first establish a prima facie case of discrimination, showing "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion..." *Id*. at 355. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine* (1981) 450 U.S. 248, 253.

Generally a plaintiff must show: 1) plaintiff was member of a protected class (race); 2) plaintiff was competently performing in the position held; 3) plaintiff suffered an adverse employment action; and 4) the action occurred under circumstances suggesting a discriminatory motive (e.g persons outside the protected class were given more favorable treatment). *McDonnell Douglas Corp. v. Green* 411 U.S. at 802.

Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. *Id*. at 355-356. A reason is

"legitimate" if it is "facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination." *Id*. at 358. If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination. *Id*. at 356.

### a. **Plaintiff Is In A Protected Class**

It is not disputed by Defendants that Plaintiff is a member of a protected class. (Caldwell Decl. ¶ 2) Discriminatory preference for any group, minority, or majority is precisely what Congress has proscribed. *McDonald v. Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273, 280. As such, Plaintiff, an African-American, easily meets this burden.

### b. **Plaintiff Produced Evidence He Performed Competently**

Plaintiff has produced competent evidence that he was a "good worker" who performed competently during his career at Boeing. (Bogardus individual depo 7:13-25) (Hammond Depo.11:1-4)

### c. **Circumstantial Evidence Can Demonstrate Discriminatory Motive**

The other element is that the adverse action occurred under circumstances suggesting a discriminatory motive (e.g. persons outside the protected class were given more favorable treatment). *McDonnell Douglas Corp. v. Green* 411 U.S. at 802. Here, Plaintiff has produced a litany of evidence suggesting and proving a discriminatory motive.

### i.   **Non-African Americans Treated More Favorably**

Caldwell has presented ample evidence non-African American employees receiving more favorable treatment than did he, to wit: First and foremost, being terminated for internet usage, something that was done by virtually all of his non-African American co-workers, as well, yet, Caldwell, one of the very few African Americans working at Boeing was the only employee terminated for that reason,

despite the fact that Boeing had no rule prohibiting such internet usage.

(Caldwell Decl. ¶ 22); (Nguyen Depo. 40:6-14; 40:17-41:17; 41:19-24); (Schimon Depo. 26:14-28:7); (Yann Depo. 17:14-18; 17:20-18:4); Caldwell, an African American was not permitted to drink from a certain water cooler from which non-African American employees were allowed to drink.  (Caldwell Decl. ¶ 11); (Nguyen Depo. 26:12-18); having security summoned when he cursed during a basketball game, while Caucasian workers were permitted to swear with impunity. (Caldwell Decl. ¶ 12); (Washington Depo. 48:19-50:12; 50:19-53:8; 54:16-55:3; 58:22-59:16); being openly mocked for his race by Boeing manager, Ron Jarvis. (Caldwell Decl. ¶ 5); (Deposition of Brian J. Nino "Nino Depo." 42:22-46:4; 46:9-23; 48:8-11; 48:23-49:7).  Being spied on by Jarvis (when no Caucasian employees were treated that way).  (Caldwell Decl. ¶ 8); (Nino Depo. 62:12-25; 63:2-18). Having his manager look the other way and decline to do anything in response to his complaint of a Caucasian Boeing employee emulating a knuckle dragging ape when Caldwell walked by, and having the same state "I can't stand you blacks." (Caldwell Decl. ¶ 14); and having Boeing security pretending not to recognize the 6'8" African American, Caldwell, unlatching their holsters and placing their hand on their guns as Caldwell exited the vehicle, when he simply was trying to drive onto the company premises as he did every day.  No Caucasian employees were ever treated this way.  (Caldwell Decl. ¶ 16).

    ii.    **Similarly Situated Personnel Not Treated the Same as Plaintiff**

Caldwell was terminated for internet usage, something that was done by virtually all of his non-African American co-workers, as well, yet, Caldwell, one of the very few African Americans working at Boeing was the only employee terminated for that reason, despite the fact that Boeing had no rule prohibiting such internet usage.    (Caldwell Decl. ¶ 22); (Nguyen Depo. 40:6-14; 40:17-41:17; 41:19-24); (Schimon Depo. 26:14-28:7); (Yann Depo. 17:14-18; 17:20-18:4).

Similarly situated non-African American employees were simply not treated the same way as Plaintiff.  Is that not the very definition of disparate treatment. Caldwell also received a CAM.  (Caldwell Decl. ¶ 12 c.)

### d.    Plaintiff Suffered An Adverse Employment Action

Caldwell clearly meets the requirement for adverse employment action. He was terminated for race-related reasons, and Boeing's excuse for the termination is clearly pretextual in light of the fact that every deposed employee witness admitted to using the Internet during down time at the Boeing, Everett facility that was under construction (leaving the employees there with substantial amounts of "down time.") The fact that Caldwell was transferred to a facility at Everett that lacked sufficient work for him is Boeing's fault, not the fault of Caldwell or his fellow employees. Notably, Manager Bogardus testified that Caldwell was replaced by a Caucasian female (Bogardus individual deposition, p. 31:5-33:7 and p. 34:14-35:12).

### 2.    The Burden Shifts Back to Boeing to Demonstrate Non-Discriminatory Reason

If the employee produces sufficient evidence to establish a prima facie case, the burden shifts back to the employer to articulate a "legitimate nondiscriminatory reason" for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. at 254-254. The Defendant's burden, like the Plaintiff's prima facie case, has been found not to be onerous. *Board of Trustees of Keene State College v. Sweeney* (1978) 439 U.S. 24, 24 [employer's burden is met if he simply explains what he had done]

### 3.    Plaintiff Can Demonstrate Significant Evidence of Pretext

If the Court accepts Defendant's explanation, the burden shifts back to Plaintiff to demonstrate that the stated reasons articulated by the County were false, or a pretext. *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 143. "Pretext" means a dishonest explanation, a lie rather than an oddity or error.

*O'Regan v. Arbitration Forums, Inc.* (7th Cir. 2001) 246 F.3d 975, 983. Pretext may be found where the employer has given shifting, contradictory, implausible, uninformed, or baseless justifications for its actions. *EEOC v. Ethan Allen, Inc.* (2d Cir. 1994) 44 F.3d 116, 120.

Discrimination can be inferred from evidence that similarly situated employees were treated more favorably than members of the protected group to which plaintiff belongs. *Hawn v. Executive Jet Mgmt.* (9th Cir. 2010) 615 F.3d 1151, 1157-1158. [whether employees are "similarly situated generally is analyzed at the pretext stage of McDonnell Douglas, not at the prima facie stage.]

Pretext may also be proven through "comparative evidence" - evidence that the employer treated similar treated similarly situated persons in similar circumstances more favorably than it treated plaintiff. *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 804 ["especially relevant to a showing of pretext would be evidence that white employees involved in acts against [the employer] of comparable seriousness...were nevertheless retained or rehired."]

Where an employer claims it subjected a plaintiff for violating work rules, plaintiff can show pretext by submitting evidence that either: 1) he did not violate the cited work rule; or 2) if he did violate the rule, other employees outside of the protected class, who engaged in similar acts, were not similarly treated. *Damon v. Fleming Supermarkets of Florida, Inc.* (11th Cir. 1999) 196 F.3d 1354, 1363.

As applied to this case, Caldwell has more than established there is a material disputed issue of fact as to Boeing's "excuse" for the termination. Boeing's witnesses testified inconsistently as to the real reason for Caldwell's termination. Caldwell's "Lead" Supervisor, Hammond, testified that he was told by Manager Bogardus that Caldwell as terminated for looking at porn on the computer. By contrast, Manager Bogardus, testified he was positive he never said Caldwell was terminated for watching porn but instead for excessive Internet use. (Compare

Hammond Depo. 26:15-27:4) with Bogardus individual depo 15:11-17). Second, as noted above, there is strong evidence that all Boeing employees at Everett used the Internet during down time.  Caldwell's supervisor, Dean Bogardus, testified Caldwell testified should never have been terminated for Internet usage on personal time, that he is unaware of any non-African American employee being surveilled for Internet usage, and that he is unaware of any non-African American employee ever being terminated for internet usage on personal time (Bogardus individual depo, p. 29:23-31:3).

### 1.    Statute of Limitations. – Race Discrimination

Defendants contend that any adverse actions arising before October 21, 2016, cannot be used as the basis for his complaint due to his filing his EEOC complaint on August 17, 2017, and he received a Notice of Right to Sue on August 23, 2017. The Court should reject this contention. Defendants took multiple adverse actions before and after October 21, 2016, and the Court should consider all of them.

It is clear that alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 112 S. Ct. 2061 (2002).  It is equally clear that that inquiry is purely one of fact, and not law. *Id.* At 107-108.  Under the continuing violations doctrine, a Title VII claim is timely if the plaintiff can show that the otherwise time-barred acts are part of a "continuing violation" of Title VII that extended into the limitations period.  *Id*.  "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. *See* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed. 1996) (hereinafter Lindemann) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence"). This is particularly true when the harassers

1    are themselves managers or when the employee reports the harassing conduct to his

2    superior and/or manager, as Caldwell did in this case.

3        The "unlawful employment practice" therefore cannot be said to occur on any

4    particular day. It occurs over a series of days or perhaps years and, in direct contrast

5    to discrete acts, a single act of harassment may not be actionable on its own. *See*

6    Claims of racial harassment are to be considered "based on the cumulative affect

7    (sic) of individual acts." *National Railroad Passenger Corp. v. Morgan*, 536 U.S.

8    101, 115, 112 S. Ct. 2061, 2074 (2002).

9        A hostile work environment claim is comprised of a series of separate acts

10   that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-

11   5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a

12   charge within a certain number of days after the unlawful practice happened. It does

13   not matter, for purposes of the statute, that some of the component acts of the hostile

14   work environment fall outside the statutory time period. Thus, a continuing violation

15   may be found in a case alleging hostile environment when there are continuous acts

16   of discrimination over a period of time provided that some of those acts fall within

17   the limitations period.  Indeed, the United States Supreme Court has held that:

18       "A hostile work environment claim is comprised of a series of separate

19       acts that collectively constitute one "unlawful employment practice."

20       42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires

21       that a Title VII plaintiff file a charge within a certain number of days

22       after the unlawful practice happened. It does not matter, for purposes

23       of the statute, that some of the component acts of the hostile work

24       environment fall outside the statutory time period."

25   *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 112 S. Ct. 2061,

26   2074 (2002).   In this case, the facts show a years-long campaign of racial

27   harassment against Caldwell.

28

Defendant argues that the continuing violation should somehow be cut off because they moved Caldwell to a new location.  This completely disregards the obvious fact that at all the locations at which Caldwell worked, he was working for Boeing.  To follow Defendant's interpretation of continuing violation would be to allow every employer to create and maintain a hostile work environment, so long as they moved their employees around frequently enough.

### 2.   Caldwell Was Subject to Adverse Action - Race Discrimination

Federal courts considering what constitutes an adverse employment action under [Title VII] have stated that an array of employer actions may constitute an adverse employment action, including hiring, firing, failure to promote, demotion, and intermediate employment decisions. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 1999). Among the many employment decisions that constitute an adverse employment action are termination, issuance of an undeserved negative performance review, and refusal to consider for promotion. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 1999).   Here, Plaintiff was subject to multiple adverse employment actions, including, for example, receiving a CAM for saying a swear word while playing basketball (while the non-African American players engaged in the identical conduct without repercussion), and termination based on the color of his skin.

### 3.   Caldwell Can Show That Adverse Actions Were Taken Against Him Because of Race - Race Discrimination

Caldwell has suffered adverse employment actions based on disparate treatment. There is clear evidence that Caldwell was singled out and treated in a disparate fashion due to his race when he was disciplined for using a swear word while playing basketball. (Caldwell Decl. ¶ 12); (Washington Depo. 48:19-50:12). Multiple Caucasian and Asian employees testified that they were allowed to use the

Internet for personal use when they had down time as the Everett facility was being built and equipped with AFP machines (i.e. Boeing's pretextual excuse for the termination).  (Nguyen Depo. 40:6-14; 40:17-41:17; 41:19-24); (Schimon Depo. 27:9-28:1; 28:4-7).

4.      **Boeing Did Not Act with Legitimate, Nondiscriminatory Reasons. Caldwell has Established Pretext. - Race Discrimination**

Boeing transparently treated Caldwell in a disparate manner than it did Caucasian employees. Boeing allowed Caucasian employees to use an occasional swear word while playing basketball in the Boeing gymnasium over the lunch hour (Caldwell Decl. ¶ 12); (Washington Depo. 58:22-59:16). The evidence of racial harassment and disparate treatment of Plaintiff is shocking and overwhelming. Multiple non-African Americans witnesses testified under oath that all employees used their computers for personal use during down time and there is no evidence of any of those employees being terminated from Everett facility.

C.      <u>Caldwell Has Shown Racial Harassment</u>

This is a classic case of Racial Harassment under Title VII, and Caldwell clearly meets each of the required elements. A plaintiff must show that: (1) he is a member of a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment complained of was based on a protected classification, (4) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment, and (5) respondeat superior. *Shinde v. Coffman Eng'rs, Inc.*, 584 F. App'x 398 (9th Cir. 2014) (citations omitted); *Strong v. Merrill Lynch*, 470 F. App'x 672, 673 (9th Cir. 2012).

Here, Caldwell, an African American is undisputedly a member of a protected group. He clearly was subjected to unwelcome harassment in the examples set forth above, among others. The harassment was based on a protected classification.

1   Indeed, the harassment to which Caldwell was subjected is right out of the "Jim

2   Crow" playbook, to wit: not being allowed to use a certain water cooler (Caldwell

3   Decl. ¶ 11); (Nguyen Depo. 26:12-18); having security called when he uttered a

4   swear word during a basketball game (Caldwell Decl. ¶ 12); (Washington Depo.

5   48:19-50:12).; enduring his manager's mockery in using perceived "black" speech

6   patterns and urban slang (Caldwell Decl. ¶ 14); insinuating by imitation of a

7   primate's movements that Caldwell, an African American employee, is an ape

8   (Caldwell Decl. ¶ 14); having the company security unlatching their holsters and

9   placing their hand on their guns as Caldwell exited the vehicle when he sought to

10  drive onto Boeing's premises (Caldwell Decl. ¶ 16).   No non-African American

11  employees at Boeing had to endure such treatment. The harassment altered the

12  conditions of employment and created an abusive working relationship and was

13  ratified and, in some cases, perpetrated by Boeing management.

14          **IV.    CONCLUSION**

15          For the reasons articulated herein, Defendant's Motions should be denied.

16  Dated: February 11, 2019               **HANEY & YOUNG, LLP**

17

18                                          /s/Steven H. Haney

19                                          Steven H. Haney,
                                            Attorney for Plaintiff (admitted pro hac vice)
20                                          1055 w. 7TH Street, Suite 1950
                                            Los Angeles, CA 90017
21                                          (213) 228-6500
                                            shaney@haneyyoung.com
22

23

24

25

26

27

28