UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRETT CALDWELL, | CASE NO. C17-1741JLR |
| Plaintiff, | ORDER GRANTING SUMMARY JUDGMENT |
| v. | |
| THE BOEING COMPANY, | |
| Defendant. | |

## I.    INTRODUCTION

Before the court is Defendant The Boeing Company's ("Boeing") motion for

summary judgment.  (MSJ (Dkt. # 47).)  The court has considered the motion, the parties'

submissions filed in support of and opposition to the motion, the relevant portions of the

record, and the applicable law.  In addition, the court heard the argument of counsel on

April 8, 2019.  Being fully advised, the court GRANTS the motion.

//

//

## II.    BACKGROUND

### A.    Mr. Caldwell's Employment at Boeing

Plaintiff Brent Caldwell is a thirty-five-year-old, African-American man.  (TAC (Dkt. # 32) ¶ 13.)  Mr. Caldwell began working at Boeing on January 11, 2013, in composite fabrication at Boeing's manufacturing facility in Frederickson, Washington. (1/22/19 Stinson Decl. (Dkt. # 48) ¶ 2, Ex. 1 ("Caldwell Dep.") at 72:14-73:1;[1] Caldwell Decl. (Dkt. # 59-1) ¶ 3.)  In November 2015, Mr. Caldwell left Boeing's Frederickson facility and transferred to a Boeing facility in Everett, Washington—Boeing's Composite Wing Center ("the CWC").  (*Id.* at 75:9-20; Bogardus Decl. (Dkt. # 49) ¶ 3; Caldwell Decl. ¶ 3.)

At the time of Mr. Caldwell's transfer, the CWC was still under construction, and the facility did not officially open until May 2016.  (Bogardus Decl. ¶ 3.)  The CWC houses Boeing's Automated Fiber Placement ("AFP") machines used to manufacture the composite wings of Boeing's 777X aircraft—its next commercial aircraft.  (*Id.*)  Mr. Caldwell worked as an AFP Operator, manufacturing aircraft components.  (*Id.* ¶ 5; Caldwell Dep. at 75:21-76:1.)  Dean Bogardus was Mr. Caldwell's supervisor while Mr. Caldwell worked at the CWC.  (1/22/19 Stinson Decl. ¶ 3, Ex. 2 ("Bogardus Corp. Dep.") at 12:24-13:6; Bogardus Decl. ¶ 5; Caldwell Dep. at 75:21-76:1.)

//

//

---

[1] Portions of Mr. Caldwell's deposition appear at multiple places on the docket.  (*See* 2/15/19 Stinson Decl. (Dkt. # 62) ¶ 2, Ex. 1.)  Irrespective of where Mr. Caldwell's deposition appears on the docket, the court cites to the deposition as "Caldwell Dep."

**B.     Mr. Caldwell's Work Laptop**

To help him perform his job, Mr. Bogardus issued Mr. Caldwell a company laptop computer soon after he arrive at the CWC.  (Bogardus Decl. ¶ 4; Caldwell Decl. at 103:22-104:2, 104:14-22.)  The laptop only worked while Mr. Caldwell was at the CWC, and he only used it at work.  (Caldwell Dep. at 103:22-104:11; *see also id.* at 105:25-106:25.)  Mr. Caldwell used the laptop to document steps involved in the composite manufacturing process.  (Bogardus Decl. ¶ 6.)  During composite builds, employees were supposed to be on the production floor.  (*Id.*)  Employees were supposed to use their remaining time for cleaning or performing online training.  (*Id.*)

Mr. Caldwell admits that he used his computer while he was at work for "surf[ing] the net" on websites like Twitter, Facebook, and Yahoo.  (Caldwell Dep. at 107:18-23.)  He also acknowledges using his computer to read "news articles that would pop up."  (*Id.* at 107:24-108:2.)  He testified that he could not estimate how many times he would go onto these websites while at work.  (*Id.* at 108:10-15.)  Mr. Bogardus was unaware that Mr. Caldwell was on his laptop for personal use during the workday because every time Mr. Bogardus approached Mr. Caldwell, it appeared that Mr. Caldwell was completing online work-related training or other work responsibilities.  (Borgardus Decl. ¶ 13; Bogardus Corp. Dep. at 24:13-24.)

**C.     Boeing's Investigation into Mr. Caldwell's Laptop Use**

In mid-December 2016, Boeing received an anonymous ethics complaint that Mr. Caldwell was misusing company time by being on Facebook and watching YouTube videos throughout the workday.  (Petrey Decl. (Dkt. # 51) ¶ 3.)  Boeing does not know

who made the complaint.  (*Id.*)  After further investigation, Boeing's Corporate Investigations group installed monitoring software on Mr. Caldwell's work laptop that allowed Boeing to monitor how Mr. Caldwell was using his work laptop during the workday.  (*Id.* ¶¶ 4-5.)  Mr. Caldwell did not know that Corporate Investigations had installed monitoring software on his laptop.  (*Id.* ¶ 5.)  Boeing monitored Mr. Caldwell's laptop usage on five working days between December 22, 2016, and January 6, 2017. (*Id.* ¶ 6.)  During this period, Mr. Caldwell spent 17.1 hours of the 40 hours he entered into Boeing's timekeeping system, or 43 percent of his workday, on non-work-related, personal use of the Internet—specifically, by accessing Facebook, Yahoo, Twitter, Instagram, and YouTube.  (*Id.* ¶¶ 7-8.)

As a part of the investigation, a Boeing investigator interviewed both Mr. Caldwell and Mr. Bogardus.  (*Id.* ¶ 9.)  In a January 31, 2017, voluntarily signed statement, Mr. Caldwell admitted that he "check[ed] social media throughout the day" but did "not keep track of the amount of time [he was] on the Internet for personal use."  (Petrey Decl. ¶ 13, Ex. A ("Caldwell Statement") at 1; Caldwell Dep. at 122:20-123:2 (acknowledging that the signature on the statement is his).)  Mr. Caldwell acknowledged that he visited "social media sites such as Twitter and Facebook," and that he does "not typically use the Internet for work related matters."  (Caldwell Statement at 1.)  The Boeing investigator explained to Mr. Caldwell that over the period of December 22, 2016, through January 6, 2017, he had "averaged over approximately 3 1/2 hours of personal Internet during the days [he] worked."  (*Id.*)  In his statement, Mr. Caldwell acknowledged that he may have "spent that amount of time on the Internet for personal use," but explained that "[i]t may

have been slow at work during that time period." (*Id.*)  He further explained that there are "down times" in his work area, and if he does not have work to do, it is common for him to be on the Internet for personal use.  (*Id.*)  He also stated that, although he does not keep track of his personal Internet time while he is at work, "spending 3 1/2 hours a day would not be typical" for him.  (*Id.*)  Nevertheless, he did not "have an idea about the amount of time" he actually spent on personal Internet time while at work.  (*Id.*)  During his deposition, Mr. Caldwell again admitted that he used his work computer during work time to surf the Internet for personal entertainment.  (Caldwell Dep. at 107:18-108:2.)

**D.    Mr. Caldwell's ECARB & Termination**

Consistent with Boeing's policy, Mr. Caldwell's documented and admitted personal use of the Internet was submitted to a Boeing Employee Corrective Action Review Board ("ECARB") for review, evaluation, and disposition.  (Lewis Decl. (Dkt. # 52) ¶¶ 13, 16; Petrey Decl. ¶ 17.)  ECARB is a committee of Boeing employees that is responsible for the review, evaluation, and disposition of serious employee misconduct.  (Lewis Decl. ¶ 14.)  Boeing uses ECARB as a formal process to review more significant cases of misconduct so that corrective action is applied consistently.  (*Id.*)  All time-misuse cases are reviewed by an ECARB.  (Miller Decl. (Dkt. # 53) ¶ 3.)

Mr. Caldwell's ECARB was on February 8, 2017.  (*Id.*)  The ECARB that reviewed Mr. Caldwell's case was composed of the following members:  (1) Steven Miller, as chair, (2) a standing member from Ethics, (3) four Employee Corrective Action ("ECA") standing members, (4) Mr. Bogardus, as Mr. Caldwell's manager, and (5) Michael Edmiston, as the relevant Human Resources ("HR") representative.  (Lewis

Decl. ¶ 18, Miller Decl. ¶ 3, Borgardus Corp. Dep. 22:24-23:3; Bogardus Decl. ¶ 15.)

Except for Mr. Bogardus and Mr. Edmiston, none of the ECARB members had ever met

Mr. Caldwell or knew his race.  (Borgardus Decl. ¶ 15 ("The ECARB was conducted by

telephone conference, and other than [Mr.] Edmiston, no one on the ECARB had ever

met [Mr.] Caldwell or were [sic] told his race."); 1/22/19 Edmiston Decl. (Dkt. # 54) ¶ 7

("Other than myself and [Mr.] Bogardus, no one on the ECARB ever met [Mr.] Caldwell

or was told his race."); *see also* 2/15/19 Edmiston Decl. (Dkt. # 63) ¶ 3 ("No member of

the ECARB who voted to discharge [Mr.] Caldwell would have had reason to know [Mr.]

Caldwell's race."); *see* Miller Decl. ¶ 3 ("ECARB members are not provided the race of

employees, only names.").)

During the ECARB, Mr. Bogardus advocated for retaining Mr. Caldwell and

would have disciplined him with time off from work instead of discharge.  (Borgardus

Corp. Decl. at 23:12-15; Borgardus Decl. ¶ 16.)  Mr. Edmiston also voted to discipline

Mr. Caldwell with time off work rather than discharge.  (2/15/19 Edmiston Decl. (Dkt.

# 63) ¶ 2.)  However, ultimately, a majority of ECARB members voted to terminate Mr.

Caldwell's employment with Boeing.  (Miller Decl. ¶ 5; Lewis Decl. ¶ 22; Bogardus

Decl. ¶ 17.)  No member of the ECARB who voted to discharge Mr. Caldwell had any

reason to know Mr. Caldwell's race.  (2/15/19 Edmiston Decl. ¶ 3.)  Indeed, Mr.

Caldwell's "race was not disclosed to ECARB members, and there was no discussion

whatsoever of his race during the ECARB."  (*Id.*)  On February 10, 2017, Mr. Bogardus

informed Mr. Caldwell of the decision to terminate his employment for misuse of

company time.  (Bogardus Decl. ¶ 18; Caldwell Dep. at 81:20-82:20.)

Boeing has discharged more than 200 employees for similar time-misuse offenses. (Lewis Decl. ¶¶ 11-12, Ex. 4.)  Of those individuals, at least 137 are Caucasian and 16 are African-American.  (*See id.*)  Nearly two-thirds of the Caucasian offenders spent less work time than Mr. Caldwell misusing the Internet.  (*See id.* (showing 89 of the 137 terminations of white employees for under 43 percent of time misuse).)  Mr. Caldwell has no evidence to counter the foregoing statistics from Boeing. (*See* Caldwell Dep. at 124:3-17 ("Q:  Do you have any information about the races of people who have been terminated for personal computer use time?  A:  I don't know anyone.").)

Mr. Caldwell admits that his personal Internet use during Boeing's investigation fell within Boeing's definition of misuse of company time.  (*See id.* at 132:7-133:6.)  Mr. Caldwell agrees that Boeing followed ECARB procedures in arriving at its decision to terminate his employment.  (*See id.* at 137:3-138:1.)

**E.  Mr. Caldwell's Lawsuit**

On August 17, 2017, Mr. Caldwell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (TAC ¶ 25, Ex. 1.)  He received a Notice of Right to Sue on August 23, 2017.  (*See id.*)  On November 11, 2017, Mr. Caldwell filed suit against Boeing.  (*See* Compl. (Dkt. # 1).)  In his third amended and operative complaint, Mr. Caldwell asserts two claims against Boeing for racial discrimination under Title VII of the Civil Rights Act of 1964:  (1) disparate treatment arising from his termination, and (2) a racially hostile work environment.  (*See generally* TAC); *see also* 42 U.S.C. § 2000e-2, *et seq*.

//

1.  <u>Mr. Caldwell's Claim for Disparate Treatment</u>

Mr. Caldwell contends that his termination from Boeing was racially motivated because of a run-in with an anonymous white male who was making fun of Mr. Caldwell due to his race around the time Mr. Caldwell was investigated for excessive personal usage of his work laptop.  (Caldwell Dep. at 87:8-13.)  Mr. Caldwell also speculates that one of his leads, Tom Hammond, whom Mr. Caldwell accuses of discriminatory behavior, *see infra* § III.E.2.d, may have made the anonymous call reporting Mr. Caldwell's personal use of the Internet.  (*Id.* at 111:4-112:21.)  However, any connection between the hotline tip and Mr. Caldwell's race is based solely on Mr. Caldwell's assumptions because he admits that he has no specific information about who made the anonymous call, but rather only his personal speculations.  (*See id.*)  Mr. Caldwell also believes Boeing's stated reason for his termination—excessive personal use of the Internet during work hours—is pretextual.  (*Id.* ¶ 22.)  He states that "[t]here was never any policy at Boeing, Everett that prevented the employees from using the Internet [during] down time."[2]  (*Id.*)  He asserts that other employees with whom he worked and

//

//

_____

[2] Mr. Caldwell states that the depositions of his co-workers supports this point. (Caldwell Decl. ¶ 22.)  Logan Schimon, a co-worker of Mr. Caldwell at both the Frederickson facility and the CWC in Everett testified that, although they never had a rule at the CWC that they could not use their computer for personal use during downtime, he assumed that his computer "was for company use only."  (Schimon Dep. (Dkt. # 59-3) at 26:14-25.)  He also testified that, rarely but "[f]rom to time," he uses his computer for personal use during work downtimes, and he believes "everyone at Boeing does it."  (*Id.* at 27:1-24.)  Derrick Yam, a co-worker of Mr. Caldwell, testified that there was no policy at the CWC in Everett that prevented operators from using the Internet during their downtime and most did do so.  (Yam Dep. (Dkt. # 59-5) at 17:20-18:4, 27:22-28:12, 37:19-38:1.)

who were not African-American "were never disciplined for this 'offense,' and [everyone] used the Internet during down time." (*Id.*)

### 2. Mr. Caldwell's Claim for Hostile Work Environment

In support of his claim for a racially hostile work environment, Mr. Caldwell describes a number of events that occurred during his employment with Boeing. Although Mr. Caldwell describes several events while he worked at Boeing's Frederickson facility, for reasons stated in the analysis section below, the court describes only those events which occurred after Mr. Caldwell transferred to the CWC in Everett, Washington. *See infra* § III.C.1. In general, Mr. Caldwell testifies that he experienced "racial harassment . . . on an ongoing, continuous, and daily basis" after he moved to the CWC (Caldwell Decl. ¶ 11), but he provides specific detail concerning a series of disparate and largely unrelated events spanning approximately 15 months (*see generally id.*).

#### a. *Waving at a Caucasian Female Employee*

Mr. Caldwell testifies that, in November 2015, he waved at a Caucasian female Boeing employee with whom he worked. (*Id.* ¶ 13.) She did not wave back and looked down at her feet. (*Id.*) Shortly thereafter, Mr. Caldwell was asked by two Caucasian security guards to "step outside." (*Id.*) Mr. Caldwell attributes his treatment by the security guards to his interaction with the Caucasian female Boeing employee. (*See id.* ("I have no doubt that if a Caucasian waved to [the Caucasian female employee] then I would not have been dragged out of the locker room by Boeing security.").)

//

### b. Caucasian Employee Imitates an Ape

Mr. Caldwell testifies that "one of the worst incidents" of racial harassment occurred on December 1, 2016, and involved Caucasian employees at the Tooling Department. (*Id.* ¶ 14.) As Mr. Caldwell was moving large pieces of metal, a Caucasian Boeing employee began "walking as a knuckle-dragging ape and making ape noises," and stated, "I can't stand you blacks," while other Caucasian employees laughed. (*Id.*) Mr. Caldwell attests that he reported the incident to Mr. Bogardus, who later accused Mr. Caldwell of trying to provoke a fight in the parking lot and, on that basis, threatened to discipline Mr. Caldwell. (*Id.*)

### c. Teasing due to Blue Footwear

Mr. Caldwell testifies that, from April 2016, through his termination, he was "singled out and harassed on almost a daily basis" due to his footwear. (*Id.* ¶ 18.) Mr. Caldwell wore a set of royal blue Timberland steel-toed boots. (*Id.*) Because the toes were reinforced with steel, they met Boeing's regulation, but Mr. Caldwell attests that "Caucasian employees and manager constantly questioned [him] about and even made fun of [his] boots." (*Id.*) Although Mr. Caldwell does not state that anyone engaging in this behavior referenced his race, he nevertheless impliedly attributes this treatment to racial discrimination. (*See id.* ('[T]he concept of an African American wearing blue boots was just too much for many of the Boeing Caucasians to take.").)

### d. Supervisor Raised to be Afraid of African-Americans

Mr. Caldwell states that one his leads, Mr. Hammond, would follow him around closely and "boss [him] around." (*Id.* ¶ 19.) Mr. Caldwell testifies that, in October 2016,

and on other occasions, Mr. Hammond told Mr. Caldwell that he was afraid of Mr. Caldwell because that is how Mr. Hammond was raised. (*Id.*) Mr. Hammond denies that he made this remark. (Hammond Dep. (Dkt. # 59-6) at 17:15-18:9.)

### e. Display of the Confederate Flag

Mr. Caldwell states in his declaration that, in October 2016, a Caucasian Boeing employee "wore Confederate flag memorabilia to work." (*Id.* ¶ 4(d).) Mr. Caldwell acknowledges that, after he complained to Boeing management, the individual moved the Confederate flag. (*Id.*) Nevertheless, Mr. Caldwell attests that the flag, although now rolled up, was still visible. (*Id.*) Although Mr. Caldwell stated in his declaration that this incident occurred while he worked at the CWC in Everett, Washington (*see id.*), during his deposition, Mr. Caldwell testified that all of the incidents involving Confederate flags occurred while he was working at Boeing's Frederickson facility (*see* Caldwell Dep. at 192:25-193:3).

### f. Complaints about R&B Music

Mr. Caldwell testifies that he played "R&B music," by artists like Diana Ross and Aretha Franklin, while he worked at the CWC in Everett. (Caldwell Decl. ¶ 7.) He testifies that he was "accused by Caucasian employees and managers of playing 'aggressive' music." (*Id.*) Although Mr. Caldwell does not state that any employee referenced his race when criticizing his music, he impliedly attributes the criticism to racial discrimination. (*See id.* ("I strongly believe any music I played as one of the only African American males at Everett would have been criticized by Caucasian management.").)

### g. *Supervisor's Derogatory Statements about African-Americans*

Mr. Caldwell testifies that Mr. Bogardus "often would say derogatory things about African Americans." (*Id.* ¶ 21.) The only example Mr. Caldwell provides, however, is an incident in which Mr. Caldwell attests that Mr. Bogardus told Mr. Caldwell that "blacks" in the South have a "meth problem and they can't help it." (*Id.*)

### h. *Requests to Transfer to Second Shift*

Mr. Caldwell attests that, several times from June 2016 to his termination, Mr. Bogardus asked another manager to try to talk Mr. Caldwell into transferring to the second shift. (*Id.* ¶ 20.) Mr. Caldwell does not testify that either Mr. Bogardus or the other manager linked this request to Mr. Caldwell's race in any way; nevertheless, Mr. Caldwell believes that Mr. Bogardus "did this to get rid of his 'black problem,'" and, once Mr. Caldwell made it clear that he would not voluntarily transfer to another shift, "Boeing management decided to run [him] out of Everett." (*Id.*)

### i. *Harassment by Security Guards*

In his declaration, Mr. Caldwell attests that, at both the Fredrickson and CWC facilities, multiple Boeing security guards would single him out and consistently ask him to show his Boeing badge. (*Id.* ¶ 16.) Yet, in his earlier deposition and in his Third Amended Complaint, Mr. Caldwell relates only one incident in 2013 involving one security guard at the Frederickson facility. (Caldwell Dep. at 194:5-195:6, 212:5-18; TAC ¶ 15.)

//

//

### j. Exclusion for Water Cooler

Mr. Caldwell testifies that, in early 2017, a Caucasian woman prevented him from drinking from a water cooler. (Caldwell Decl. ¶ 11.) Mr. Caldwell attests that the woman screamed at him that the water cooler was not for him. (*Id.*) He does not testify that the woman referred in any way to his race, but in his declaration he implies that she excluded him on that basis. (*See id.* ("Segregated water coolers?").) In his deposition, however, Mr. Caldwell acknowledges that he does not have any evidence that the woman's actions were based on his race. (Caldwell Dep. at 239:25-240:3 ("Q: Do you have any evidence that the actions of the older caucasian [sic] woman were based on your race? A: I do not. . . .").) Mr. Caldwell states that he reported the incident to his manager, Mr. Bogardus, but Mr. Bogardus did nothing in response. (Caldwell Decl. ¶ 11.) Boeing managers told other employees, including Caucasian and Asian-American employees, that they could not use the water cooler in question unless they worked for the 787 group because the water cooler in question was paid for from the 787 budget. (*See, e.g.*, Koahou Decl. (Dkt. # 55) ¶¶ 3-9; McNally Decl. (Dkt # 56) ¶¶ 3-9.) Mr. Caldwell was not part of the 787 group. (*See* McNally Decl. ¶ 8.)

### k. Basketball-Related Incidents

Mr. Caldwell states that there were a series of basketball-related incidents at a Boeing basketball court involving Ron Anderson, who is a Caucasian Boeing employee. (Caldwell Decl. ¶¶ 12(a)-(c).) First, Mr. Caldwell attests that, in December 2015, Mr. Anderson falsely accused him of stealing basketballs, which Mr. Caldwell owned. (*Id.* ¶ 12(a).) Mr. Caldwell testifies that Mr. Anderson then stated that there was a rule that

Boeing employees could not bring their own basketballs, despite the fact that no such rule was posted. (*Id.*) Mr. Caldwell states that a few weeks later the sign at the court was changed to add this rule. (*Id.*)

Second, Mr. Caldwell testifies that, on February 13, 2016, Mr. Anderson told him that dunking the basketball was not allowed despite the absence of any such rule on the posted sign. (*Id.* ¶ 12(b).) Mr. Caldwell states that after he pointed out this fact, the sign was changed to add a "no dunking" rule. (*Id.*)

Third, Mr. Caldwell states that, on February 19, 2016, he said a curse word, and Mr. Anderson admonished him not to swear despite the fact that Caucasian players were also swearing without admonishment. (*Id.* ¶ 12(c).) Mr. Caldwell attests that he apologized for saying the curse word and went back to playing, but Mr. Anderson stated that he did not like Mr. Caldwell's attitude, began screaming at Mr. Caldwell, and ordered Mr. Caldwell to leave the gym. (*Id.*) Mr. Caldwell states that Mr. Anderson blocked his exit from the gym and then called Boeing security. (*Id.*) Mr. Caldwell attests that Boeing security would not listen to his side of the story and demanded to see his Boeing identification. (*Id.*) Mr. Caldwell testifies that he reported the incident to his supervisor, Mr. Bogardus, and—instead of taking Mr. Caldwell's side—Mr. Bogardus disciplined Mr. Caldwell. (*Id.*)

## F.    Boeing's Motion for Summary Judgment

On January 22, 2019, following the close of discovery, Boeing timely filed a motion for summary judgment regarding Mr. Caldwell's claims for (1) employment discrimination in his termination, and (2) a hostile work environment. (*See* MSJ; *see*

Sched. Order (Dkt. # 21) at 1 (setting the discovery cutoff on December 24, 2018 and the dispositive motions deadline on January 22, 2019).)  Mr. Caldwell opposed Boeing's motion.  (*See* Resp. (Dkt. # 59).)  The court now considers Boeing's motion.

## III.   ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658. The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B.   Mr. Caldwell's Disparate Treatment Claim

Under the *McDonnell Douglas* burden-shifting analysis,[3] Mr. Caldwell bears the burden of first establishing a prima facie case of employment discrimination by offering

//

---

[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

evidence to satisfy the following elements: (1) he is a member of a protected class; (2) he was qualified for his position and performing satisfactorily; (3) he experienced an adverse employment action; and (4) similarly-situated individuals outside the claimed protected class were treated more favorably, or other circumstances give rise to an inference of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155-56 (9th Cir. 2010). If Mr. Caldwell can establish a prima facie case, the burden of production, but not persuasion, shifts back to Boeing to articulate a legitimate, nondiscriminatory reason for its challenged actions. *See id.* at 1155 (citing *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000)). If Boeing meets this burden, Mr. Caldwell must raise a triable issue of material fact as to whether Boeing's proffered reasons for Mr. Caldwell's termination are mere pretext for unlawful discrimination. *See id.* at 1155-56 (citing *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007)). The difference between the first and third steps of the framework "is not without some consequence." *Id.* at 1158. Specifically, Mr. Caldwell's "burden is much less at the prima facie stage than at the pretext stage." *See id.*; *see also Stecki v. Motorola, Inc.* 703 F.3d 392, 393 (9th Cir. 1983) (requiring "specific, substantial evidence of pretext" to defeat the employer's motion for summary judgment); *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004) (describing the pretext stage as "rigorous," but the prima facie stage as "not onerous"). Despite the burden shifting, the ultimate burden of proof remains on Mr. Caldwell to show that Boeing intentionally discriminated against him because of his race. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).

//

1. <u>Mr. Caldwell Fails to Establish the Fourth Element of His Prima Facie Case of Disparate Treatment</u>

The court concludes that Mr. Caldwell cannot establish the fourth element of his prima facie claim—that similarly-situated individuals outside the claimed protected class were treated more favorably, or other circumstances give rise to an inference of discrimination. *See Hawn*, 615 F.3d at 1155. Mr. Caldwell must not only show that Boeing treated employees outside his protected class more favorably, but he must also bring forward evidence that these employees are similar in all material respects. *Morgan v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). As discussed below, he fails to do so.

Since 2012, Boeing has discharged more than 200 employees—of different races—after investigations substantiated that those employees committed the same or a similar time-misuse violation as Mr. Caldwell. (*See* Lewis Decl. ¶ 11.) Boeing terminated the majority of these employees for misuse of company time by using a computer for non-work related reasons. (*Id.*) Of these individuals, at least 137 are Caucasian and 16 are African-American. (*See id.* ¶ 12, Ex. 4.) Two-thirds of the Caucasian offenders spent less time than Mr. Caldwell misusing the Internet. (*See id.*) Thus, Boeing discharged more than eight times as many Caucasian employees as African-American employees, and at least 89 Caucasians employees who had less egregious percentages of misused time than Mr. Caldwell. Mr. Caldwell has not presented contrary evidence. (*See* Caldwell Dep. at 124:3-8 (stating that he "had no clue" that Boeing terminated others for excessive Internet use or the races of those individuals).

//

Yet, Mr. Caldwell contends that he can show that similarly situated individuals outside of his protected class were treated more favorably because his immediate co-workers were not similarly disciplined for using the Internet on their phones or available work computers for personal use during work hours. (Resp. at 17-18.) These facts, even if true, do not change the court's analysis. First, the fact that Mr. Caldwell's immediate co-workers were not disciplined for similar conduct does not alter the fact that Boeing has terminated large numbers of non-African-American employees for similar or nearly identical offenses. (*See* Lewis Decl. ¶¶ 11-12, Ex. 4.) Thus, even if Boeing inadvertently failed to discipline certain co-workers of Mr. Caldwell, this failure would not demonstrate that Mr. Caldwell was treated differently because of his race.

More important, Mr. Caldwell's argument ignores that his co-workers were not similarly situated to him "in all material respects" because Boeing was unaware of Mr. Caldwell's co-workers' alleged misuse of the Internet. Unlike with Mr. Caldwell—where Boeing received an anonymous ethics complaint about his Internet usage (Petrey Decl. ¶ 3)—there is no evidence that Boeing had knowledge of Mr. Caldwell's coworkers' alleged time or Internet misusage. This lack of evidence is fatal to Mr. Caldwell's argument. *See, e.g.*, *Chavez v. Casas Christian Preschool*, No. CV-11-177-TUC-FRZ, 2012 WL 2091641, at *6 (D. Ariz. May 9, 2012), *report and recommendation adopted*, No. CV 11-177-TUC-FRZ, 2012 WL 2092153 (D. Ariz. June 11, 2012) (concluding that the plaintiff's comparator "was not a similarly situated employee because her alleged misconduct was not brought to the attention of the supervisors"); *Jagessar v. Walgreen Co.*, No. 13-21575-CIV, 2014 WL 1092370, at *10

(S.D. Fla. Mar. 19, 2014) (entering summary judgment where the plaintiff failed to offer evidence that her "comparators were accused of or investigated for the same conduct" by the employer); *Jackson v. Blockbuster, Inc.*, No. CIV.A.4:09-CV-119, 2010 WL 2268086, at *5 (E.D. Tex. June 4, 2010) (finding no prima facie case where the plaintiff failed to submit evidence that anyone ever reported the misconduct of the plaintiff's alleged comparators to the employer). Thus, the court concludes that Mr. Caldwell fails to show that Boeing treated similarly situated employees outside of Mr. Caldwell's protected class more favorably.

Mr. Caldwell also attempts to paint an inference of racial discrimination in his termination by referencing the entire universe of his allegations against Boeing. (Resp. at 16-17.) This approach also fails to change the court's analysis because Mr. Caldwell offers no evidence connecting these other allegations to his termination. None of Mr. Caldwell's various allegations of racial discrimination involve individuals who voted to terminate his employment during the ECARB process.[4] Mr. Caldwell cannot use the alleged remarks or actions of non-decision-makers to establish an inference of discrimination, as courts routinely hold that there must be a connection between any alleged remark and the adverse employment decision. *Habib v. Tote Servs.*, No. C14-1685RSL, 2017 WL 108553, at *7 (W.D. Wash. Jan. 11, 2017), *aff'd sub nom. Habib v. TOTE Servs., Inc.*, 699 F. App'x 759 (9th Cir. 2017) (granting summary

---

[4] Although Mr. Caldwell alleges that Mr. Bogardus was involved in some of his allegations of discriminatory conduct, *see supra* §§ II.E.2.g, h, j, Mr. Bogardus did not vote to terminate Mr. Caldwell's employment during the ECARB process (Borgardus Corp. Dep. at 23:12-15; Borgardus Decl. ¶ 16).

judgment as to the plaintiff's discriminatory termination claim where the plaintiff failed to offer "any evidence of bigotry" by the relevant decision-maker and was unable to rely on the "racist and Islamophobic views" of select coworkers, which the court found did not motivate the plaintiff's termination); *see also DeHorney v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 879 F.2d 459, 467-68 (9th Cir. 1989) (affirming the grant of summary judgment in favor of the employer because the plaintiff failed to demonstrate a nexus between a subordinate's racially discriminatory remark and the superior's decision to terminate the plaintiff); *Orum v. Chertoff*, No. C05-00795 MJJ, 2007 WL 4593497, at *6 (N.D. Cal. Dec. 28, 2007) ("If remarks are offered as evidence of discriminatory intent, they must either be those made by the decision-maker herself or Plaintiff must show a sufficient nexus between the remarks and the decision-makers' subsequent employment decisions.").

Thus, the court concludes that Mr. Caldwell has failed to meet his burden of establishing the fourth element of his prima facie disparate treatment claim.[5] Accordingly, Boeing is entitled to summary judgment on Mr. Caldwell's claim for racially-motivated disparate treatment in his termination.

//

//

//

---

[5] Boeing also maintains that Mr. Caldwell cannot meet his burden concerning the second element of his prima facie disparate treatment claim—that he was qualified for his position and performing satisfactorily. (MSJ at 13-14.) Because the court determines that Mr. Caldwell failed to meet his burden with respect to the fourth element, the court need not consider this argument.

2. <u>Mr. Caldwell Cannot Show that Boeing's Rationale Was Pretextual</u>

Even if Mr. Caldwell could establish a prima facie case for discrimination in his termination, his claim would still fail because he cannot show with "specific evidence," *Coleman*, 232 F.3d at 1282, that Boeing's stated legitimate, nondiscriminatory reason for his termination was merely a pretext for intentional discrimination. *See Hawn*, 615 F.3d at 1155-56.

Mr. Caldwell does not dispute that he spent time surfing the Internet during work hours, and that a company investigation concluded that his Internet usage comprised 43 percent of his total work time. (*See* Petrey Decl. ¶¶ 7-8.) Further, Mr. Caldwell admits that he does "not typically use the Internet for work related matters." (Caldwell Statement at 1.) Courts have found this type of misconduct—excessive, personal use of the Internet—is sufficient to establish a legitimate, non-discriminatory, and non-pretextual basis for termination. *See, e.g.*, *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 932-35 (8th Cir. 2006) (finding the termination nondiscriminatory where it was "based upon [the plaintiff's] excessive and inappropriate use of the Internet"); *Sawa v. RDG-GCS Joint Ventures III*, No. CV 15-6585, 2017 WL 3033996, at *20 (E.D. Pa. July 14, 2017) ("[C]ourts frequently hold that an employee's improper use of an employer's computer is a legitimate basis for termination.") (citing cases); *Delgado v. Combs*, No. A-09-CA-571-SS, 2010 WL 3909398, at *5 (W.D. Tex. Sept. 28, 2010) (granting summary judgment based on "excessive internet use").

Further, the question of pretext is not whether Boeing's business justification is "objectively false," but whether Boeing "honestly believed its reasons for its actions,"

even if others might think the reason was "foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)).  Mr. Caldwell presents no evidence to undermine Boeing's legitimate business decision to terminate his employment in accordance with company policy and after its investigation and application of the ECARB disciplinary process.  Mr. Caldwell admits he has no knowledge of who made the anonymous ethics hotline complaint about his computer usage except for guesses (Caldwell Dep. at 111:4-112:21, 115:2-15), nor any knowledge of the investigation into his computer usage or ECARB disciplinary process other than suppositions and conjecture (*id.* at 115:16-116:16, 139:2-25, 146:17-21).  He also admits that Boeing followed proper ECARB procedures in his dismissal.  (*Id.* at 137:23-138:1.)

Mr. Caldwell "guesse[s]" that either his team lead, Mr. Hammond, or someone from the tooling department reported his excessive computer usage.  (*Id.* at 112:4-11, 87:8-24.)  He suggests that one of these individuals may have reported his computer usage due to racial animus, but his assertion—based on nothing more than speculation—is insufficient to withstand summary judgment.  *See, e.g.*, *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995) (holding that the plaintiff's "conclusory assertions that [the defendant] must have had a discriminatory intent . . . are insufficient to avoid summary judgment" in handicap discrimination case); *Kohler v. Ericsson, Inc.*, 847 F.2d 499, 501 (9th Cir. 1988) (holding that the plaintiff's assertion "based 'solely on conjecture and speculation'" that the plaintiff's supervisor "wanted to contrive a reason for her discharge" did not defeat summary judgment); *Carroll v. Univ. of Wash.*, No.

C08-1498Z, 2010 WL 11561612, at *5 (W.D. Wash. Sept. 27, 2010) (holding that the plaintiff's "subjective belief that the department treated him less favorably than other employees as a result of his association with African-Americans" was insufficient to withstand summary judgment). In any event, indisputably, neither of these individuals had any involvement in Boeing's decision to terminate Mr. Caldwell. (*See* Bogardus Decl. ¶ 15; *see also* Lewis Decl. ¶ 18.) Accordingly, even if their actions arose out of a discriminatory intent, that action cannot be imputed to Boeing because Boeing opened an independent investigation and ECARB process that led to Mr. Caldwell's termination. *See Poland v. Chertoff*, 494 F.3d 1174, 1183 (9th Cir. 2007) ("[I]f an adverse employment action is the consequence of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer.") (citing *Willis v. Marion Cty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant.").

Moreover, Mr. Caldwell presents no evidence to counter Boeing's evidence that the ECARB members who voted for his termination had never met him and did not know his race.[6] (*See* Bogardus Decl. ¶ 15; 1/22/19 Edmistion Decl. ¶ 7; 2/15/19 Edmiston

---

[6] At oral argument, counsel for Mr. Caldwell argued that if Boeing wanted to prove that the ECARB members who voted for Mr. Caldwell's termination did not know his race, Boeing should have submitted declarations from each of those individuals to verify that fact. Boeing submitted declarations from three members of the ECARB, all of whom testified that none of the ECARB members who voted for Mr. Caldwell's termination knew his race. (*See* Borgardus Decl. ¶ 15; 1/22/19 Edmiston Decl. ¶ 7; 2/15/19 Edmistion Decl. ¶ 3; *see also* Miller Decl. ¶ 3.)

Decl. ¶¶ 1-3; *see also* Miller Decl. ¶ 3 ("ECARB members are not provided the race of employees, only names.").)  This undisputed fact prevents a finding of pretext concerning Boeing's decision to terminate Mr. Caldwell.  *See, e.g.*, *Robinson v. Adams*, 847 F.2d 1315, 1316-17 (9th Cir. 1987) (finding no intentional discrimination in hiring where the decision-makers were unaware of the plaintiff's race, and the plaintiff offered no evidence to call their credibility into question); *Kwesele v. King Cty.*, No. 2:17-CV-1426-RAJ, 2019 WL 266450, at *9 (W.D. Wash. Jan. 18, 2019) (finding that the plaintiff failed to establish pretext because he was unable to show how the adverse employment decision was "motivated by racial animus from the relevant decision-makers"); *Nguyen v. Walgreen Corp.*, No. EDCV 08-1931-JTM-FMO, 2010 WL 11595838, at *6 (C.D. Cal. May 17, 2010) (granting summary judgment "[s]ince [the plaintiff] has not shown the existence of any discriminatory animus by these decision makers").

Nevertheless, Mr. Caldwell argues that Boeing's reason for terminating him must be pretext because neither he nor his immediate colleagues at the CWC knew that personal use of the Internet during inactive periods was not permitted, they all engaged in this behavior, and yet, he was the only one of the group terminated for that reason.  (*See* Resp. at 17-18; *see also* Caldwell Decl. ¶ 22.)  Although Mr. Caldwell may believe that "[t]here was never any policy at Boeing . . . that prevented the employees from using the

---

Further, one of those declarants, in fact, ultimately voted to terminate Mr. Caldwell.  (Miller Decl. ¶ 5.)  In any event, Mr. Caldwell bears the burden on the issue of pretext.  *See Coleman*, 232 F.3d at 1281.  Thus, if Mr. Caldwell wished to counter Boeing's evidence concerning the ECARB members' knowledge of his race, it was up to Mr. Caldwell to develop that evidence during discovery and submit it in response to Boeing's motion for summary judgment.  Mr. Caldwell's attempt to improperly shift the burden of proof to Boeing is unavailing.

Internet when we had down time" (Caldwell Decl. ¶ 22), his assertion does not render

Boeing's decision pretextual or create an issue of fact that prevents summary judgment.

Boeing submitted documentary evidence showing that its policies provide that personal

usage of the Internet for more than 20 percent of an employee's work time typically

results in termination. (Lewis Decl. ¶¶ 10, 20, Ex. 7.) Further, Mr. Caldwell

acknowledged in his deposition that his computer usage as found in the investigation fell

within the definition of that violation. (Caldwell Dep. at 132:7-133:6.) The fact that Mr.

Caldwell, or his co-workers, may not have understood, may not have been aware of, or

may not have been properly informed of Boeing's policy does not render Boeing's

decision to terminate Mr. Caldwell pretextual. Indeed, the case law is clear that Boeing

merely has to "honestly believe[] its reasons for its actions." *Villiarimo*, 281 F.3d at

1063. Boeing's decision could be wrong or ill-informed for any number of reasons, and

this would not mean that Boeing's decision was pretextual under Title VII. So long as

Boeing "honestly believed" its reasons for terminating Mr. Caldwell, its reasons for doing

so could, in fact, be "foolish or trivial or even baseless." *See id.* Because Mr. Caldwell

"present[s] no evidence that [Boeing] did not honestly believe its proffered reasons," he

fails to raise a genuine material factual dispute concerning pretext here. *See id.*

Mr. Caldwell also argues that some of his co-workers were not disciplined for

their personal use of the Internet. (Resp. at 19-20.) As detailed above, this argument

fails because: (1) the undisputed evidence is that Boeing has terminated 137 Caucasian

employees for the same or lesser conduct than Mr. Caldwell (Lewis Decl. ¶ 11, Ex. 4),

//

and (2) Mr. Caldwell has not shown that Boeing had knowledge of his co-workers' alleged Internet misuse.  *See supra* § III.B.1.

Finally, Mr. Caldwell also argues that "Boeing's witnesses testified inconsistently as to the real reason for [his] termination."  (Resp. at 19-20.)  First, Mr. Caldwell cites Mr. Hammond's testimony that he had heard that Mr. Caldwell was terminated for watching pornography on his work computer.  (*See id.* (citing Hammond Dep. at 26:15-27:4).)  It is undisputed, however, that Mr. Hammond, played no role in the decision to terminate Mr. Caldwell (*see* Miller Decl. ¶ 3; Bogardus Decl. ¶ 15), and therefore, Mr. Hammond's understanding of the reason for Mr. Caldwell's termination cannot raise an issue of fact concerning the pretextual nature of Boeing's decision.  Second, Mr. Calsdwell argues that Mr. Bogardus did not believe that Mr. Caldwell should have been terminated.  (Resp. at 20; *see also* Bogardus Corp. Dep. at 23:12-23.)  However, Boeing's ECARB works on the basis of a "majority rules" process.  (Borgardus Corp. Dep. at 23:9-11.)  Thus, Mr. Bogardus's vote was just one among all members of the Board, and individually his opinion or vote is irrelevant to Boeing's ultimate decision.  (*See id.*)  Moreover, even viewing the evidence in the light most favorable to Mr. Caldwell, the fact that Mr. Bogardus, who knew Mr. Caldwell, voted to retain Mr. Caldwell, while other ECARB members, who did not know Mr. Caldwell or his race, voted for termination, demonstrates—contrary to Mr. Caldwell's assertions—that Boeing's process was indeed not tainted by racial discrimination.

In sum, the court concludes that Mr. Caldwell has not demonstrated the fourth element of his prima facie case and has not presented any specific evidence that Boeing's

stated reason for terminating him was pretextual.  For these reasons, the court grants

Boeing's motion for summary judgment on Mr. Caldwell's claim for racial

discrimination based on disparate treatment in his termination.

**C.      Mr. Caldwell's Claim for a Hostile Work Environment**

To state a claim for hostile work envirnonment, Mr. Caldwell must show:  (1) he

was subjected to verbal or physical conduct because of his race, (2) the conduct was

unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the

conditions of employment and create an abusive working environment.  *Manatt v. Bank*

*of Am.*, 339 F.3d 792, 798 (9th Cir. 2003).  For the last element, the court considers "all

the circumstances, including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  *Vasquez*, 349

F.3d at 642 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).  "In

addition, the working environment must both subjectively and objectively be perceived as

abusive."  *Id.*  "A hostile work environment claim is composed of a series of separate but

related acts that collectively constitute one unlawful employment practice."  *Leland v.*

*City & Cty. of S.F.*, 576 F. Supp. 2d 1079, 1091 (N.D. Cal. 2008) (citing *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

Title VII, however, "is not a general civility code," *EEOC v. Prospect Airport*

*Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010), and in the Ninth Circuit, there is "a high

burden to finding a hostile work environment," *Dawud v. Boeing Co.*, No. C17-

1254-JCC, 2018 WL 4735703, at *6 (W.D. Wash. Oct. 2, 2018) (citing *Manatt*, 339 F.3d

at 798-99). "In general, the Ninth Circuit has found that . . . 'isolated' incidents, occurring sporadically over a long period of time, are not severe or pervasive enough to alter the conditions of employment." *Henry v. Regents of the Univ. of Cal.*, 37 F. Supp. 3d 1067, 1085 (N.D. Cal. 2014), *aff'd*, 644 F. App'x 787 (9th Cir. 2016) (citing and quoting *Manatt*, 339 F.3d at 795-99)).

     1. <u>Allegations from the Frederickson Facility</u>

     Mr. Caldwell contends that he was subjected to a number of racially-motivated or racially-tinged incidents while he worked at Boeing's Frederickson facility and these incidents support his hostile work environment claim. (*See* Caldwell Decl. ¶¶ 3-10.) Yet, Mr. Caldwell's transfer from the Frederickson facility to the CWC in Everett cuts off the relevance of the Frederickson incidents to his hostile workplace claim. His transfer, which altered the nature of his job, his workplace location, his coworkers, and his supervisors (*see* Caldwell Dep. at 75:9-77:5), severed any notion of a continuous or related hostile work environment lasting throughout his employment.

     In *Morgan*, the Supreme Court explained that, for a hostile work environment charge to be timely, "the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment." 536 U.S. at 118. The acts within and outside of this period must have some "relation to" each other. *Id.* In other words, a court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120. This means that unrelated or discrete acts occurring outside that 300-day window—here, anything prior to October 21, 2016—are

time-barred and cannot support a Title VII claim.  *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) ("If the flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of timely non-discrete acts.").  Indeed, "*Porter* teaches that . . . merely asserting otherwise untimely discrete acts as part of a hostile work environment claim does not make them timely."  *Yonemoto v. Shinseki*, 3 F. Supp. 3d 827, 845 (D. Haw. 2014).  Instead, if the otherwise untimely acts did not consist of the "same type of employment actions, . . . [or] were [not] perpetrated by the same managers," they cannot form part of a single unlawful practice, and thus cannot be considered alongside otherwise timely allegations as a part of a hostile-work-environment claim.  *Porter*, 419 F.3d at 893.

Mr. Caldwell transferred from the Frederickson facility to the CWC in November 2015.  (Caldwell Decl. ¶ 3.)  Thus, all of the acts Mr. Caldwell cites from the Frederickson facility are only actionable if they have some relation to the acts he alleges from the CWC facility within the statutory period.  Courts have repeatedly held that a transfer to a new position or facility breaks the chain necessary to link the otherwise untimely acts to those that are timely.  *See, e.g.*, *Davis v. City of Seattle*, No. C06-1659Z, 2008 WL 202708, at *15 (W.D. Wash. Jan. 22, 2008), *aff'd*, 343 F. App'x 230 (9th Cir. 2009) ("[E]ven if the Court were to assume plaintiff was subjected to harassment on account of gender and/or sexual orientation during her tenure under [the alleged harasser], after plaintiff transferred to the South Substation, she was never again supervised by [the alleged harasser], . . . effectively sever[ing] the relationship between [the alleged harasser's] behavior and any hostile or harassing actions occurring within the

limitations period."); *Fairley v. Potter*, No. C-01-1363 VRW, 2003 WL 403361, at *10 (N.D. Cal. Feb. 13, 2003) (finding that certain incidents are not part of the same work environment where "[the plaintiff] admits that she had entirely new supervisors and co-workers at the Richmond facility . . . [and] she does not assert any links between either the personnel or the events at the Richmond and Oakland facilities other than the fact that both are run by the postal service"); *Gonzalez v. Cty. of Yolo*, No. 2:13-CV-01368-KJM-AC, 2015 WL 4419025, at *7 (E.D. Cal. July 17, 2015) (finding that the plaintiff's change in job assignments and subsequent minimization of contact with her alleged harasser disrupted the continuing nature of the violation and rendered later acts distinct from earlier acts); *Costanzo v. U.S. Postal Serv.*, No. 00 CIV. 5044 (NRB), 2003 WL 1701998, at *11 (S.D.N.Y. Mar. 31, 2003) ("[N]one of the events allegedly occurring after the statutory cut-off date appear to have any relation to plaintiff's allegations concerning events before the . . . transfer. Hence, one might even assume arguendo that plaintiff experienced a hostile work environment at some point before her . . . transfer without it affecting the result."); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010) (finding an offensive comment insufficiently related to other allegations in part because the plaintiff had transferred to a different department, "which was a different environment in material respects—and in a different sector of the building"); *Jones v. Allstate Ins. Co.*, 707 F. App'x 641, 648 (11th Cir. 2017) ("Transferring [the plaintiff] to another team is a sufficiently intervening act severing the initial hostile work environment from the subsequent one.").

//

In response, Mr. Caldwell argues that all of the acts he describes—irrespective of whether they occurred at the Frederickson facility or at the CWC—should apply to his hostile work environment claim because at both locations "he was working for Boeing." (Resp. at 22.) This argument, however, ignores the myriad case authority to the contrary cited both in Boeing's motion (MSJ at 21-22) and by the court above. Mr. Caldwell provides no evidence linking any of the offensive acts he describes in his declaration and deposition that occurred at the Frederickson facility with those he describes at the CWC in Everett. (*See generally* Dkt.) Accordingly, the court concludes that the acts he describes at the Frederickson facility are insufficiently related to those at the CWC to form a part of his hostile work environment claim, and the court does not consider them.[7]

2.  Portions of Mr. Caldwell's Declaration that the Court Disregards

Boeing argues that the court should disregard portions of the Mr. Caldwell's declaration because it conflicts with his prior deposition testimony. (Reply (Dkt. # 61) at 11-12.) "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit [or declaration] contradicting his prior deposition testimony." *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). The reason for this "sham affidavit" rule is that, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure

//

---

[7] Boeing also argues that several incidents that Mr. Caldwell describes at the CWC are also time-barred. (MSJ at 21-22.) Because the court concludes that Boeing is entitled to summary judgment on other grounds, it does not consider this argument.

1    for screening out sham issues of fact."  *Id.*  Nevertheless, this rule should be "applied

2    with caution," "the inconsistency between a party's deposition testimony and subsequent

3    affidavit must be clear and unambiguous," and the court must "make a factual

4    determination that the contradiction was actually a 'sham.'"  *Van Asdale v. Int'l Game*

5    *Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009).  Thus, "the non-moving party is not

6    precluded from elaborating upon, explaining or clarifying prior testimony elicited by

7    opposing counsel on deposition and minor inconsistencies that result from an honest

8    discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an

9    opposition affidavit."  *Id.* (internal alterations omitted) (quoting *Messick v. Horizon*

10   *Indus.*, 62 F.3d 1227, 1231 (9th Cir.1995)).

11           Boeing specifically challenges four portions of Mr. Caldwell's declaration.  (Reply

12   at 12.)  Two of these portions relate to events that occurred in the Frederickson facility.

13   (*See id.* (citing an incident that Mr. Caldwell describes in his declaration in which a

14   coworker at the Frederickson facility called him a racial epithet and another incident

15   involving missing car keys).)  Because the court has already ruled that it will not consider

16   events from the Frederickson facility as a part of Mr. Caldwell's hostile work

17   environment claims, the court does not consider Boeing's challenge to these two portions

18   of Mr. Caldwell's declaration.  The other two challenged portions, however, relate to Mr.

19   Caldwell's time at the CWC in Everett.  (*See id.* (citing incidents involving the

20   Confederate flag and Boeing security guards).)  Accordingly, the court considers whether

21   these portions of Mr. Caldwell's declaration fall within the Ninth Circuit's "sham

22   affidavit" rule.

First, in his deposition, Mr. Caldwell describes a single traffic stop by a Boeing security guard at the Frederickson facility. (Caldwell Dep. at 194:5-195:6.) When asked by counsel if he remembered "[a]ny other incidents," Mr. Caldwell responds: "That's all that I can remember at this present moment." (*Id.* at 195:5-6.) His deposition testimony concerning the traffic stop by a single Boeing officer is also consistent with the allegations in his operative complaint as well as the allegations in his charge to the EEOC. (*See* TAC ¶ 15; 2/15/19 Stinson Decl. ¶ 5, Ex. 4 at 3.) Yet, in his later declaration, Mr. Caldwell complains about multiple "guards unlatching their holsters and placing their hands on their guns as [he] existed the vehicle." (Caldwell Decl ¶ 16.) He also embellishes his deposition testimony by declaring that, at both the Frederickson facility and the CWC, "Caucasian employees, managers, and [Boeing] security guards consistently asked [him] to show [his] Boeing badges, as if they could not believe that an African American male should be on the premises." (*Id.*)

The court finds no reason to disregard this portion of Mr. Caldwell's declaration under the sham affidavit rule. First, the incident concerning the traffic stop occurred while Mr. Caldwell was working at the Frederickson facility, and the court has already ruled that events at that facility do not timely relate to Mr. Caldwell's hostile work environment claim. *See supra* § III.C.1. Second, the statement in Mr. Caldwell's declaration concerning the numerous demands he received from employees, managers, and security guards at both locations to present his Boeing badge is not clearly and unambiguously inconsistent with prior deposition testimony. *See Van Asdale*, 577 F.3d

//

at 998-99. Therefore, the court does not disregard this portion of Mr. Caldwell's declaration.

In his deposition, Mr. Caldwell also testified about incidents in which Boeing employees either displayed a Confederate flag from a vehicle or wore Confederate flag memorabilia on clothing. (Caldwell Dep. at 192:5-193:17.) With respect to both incidents, Mr. Caldwell plainly testified that both occurred at the Frederickson facility. (*Id.* at 192:6-7 ("[S]o I used to park my car across from the 60 building in Frederickson . . .); 193:3 ("This was all in Frederickson or whatever.").) Yet, in his later declaration, although he describes the event involving the flag as occurring in Frederickson, he now describes the event involving the memorabilia as occurring at the CWC facility in October 2016. (Caldwell Decl. ¶ 4(d).) This portion of Mr. Caldwell's declaration clearly contradicts his earlier deposition testimony. Further, nowhere in his declaration does he attempt to "elaborate[e] upon, explain[], or clarify[]" his prior deposition testimony in relationship to the testimony in his declaration. *See Van Asdale*, 577 F.3d at 998-99. The court concludes that this portion of Mr. Caldwell's declaration was submitted for the purpose of manufacturing a factual issue in an attempt to undermine to Boeing's motion for summary judgment and is, therefore, a sham. *See* II.E.2.e; *see also* Caldwell Decl. ¶ 4(d). Accordingly, the court disregards this portion of Mr. Caldwell's declaration for purposes of evaluating his hostile work environment claim.

//

//

### 3. Unreported Events

Boeing argues that it cannot be held liable for the conduct of Mr. Caldwell's coworkers if Mr. Caldwell did not report the conduct to his supervisor or management. "Where harassment by a co-worker is alleged, the employer can be held liable only where 'its own negligence is a cause of the harassment.'  Title VII liability is direct, not derivative:  An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct." *Swenson v. Potter*, 271 F.3d 1184, 1191-92 (9th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)); *see also Hoe Xuan Nguyen v. ING Fin. Advisers LLC*, No. C04-1310RSM, 2006 WL 1075216, at *6 (W.D. Wash. Apr. 21, 2006), *aff'd sub nom. Hoe Xuan Nguyen v. N. Life Ins*., 234 F. App'x 526 (9th Cir. 2007).  "In a case where a co-worker is the harasser who created the hostile work environment, the plaintiff bears the additional burden of proving that 'the employer knew or should have known of the harassment but did not take adequate steps to address it.'"  *Sines v. Bellingham Cold Storage Co., LLC*, No. C12-2227RAJ, 2014 WL 1319789, at *4 (W.D. Wash. Mar. 28, 2014) (quoting *Swinton v. Potomac Corp*., 270 F.3d 794, 803 (9th Cir. 2001)).

Here, there is no evidence that Mr. Caldwell reported to a supervisor or manager much of the mistreatment he describes.  He does not suggest that he reported any of the incidents in which Boeing security guards asked to see his badge that he subjectively thought were racially motivated.  (*See* Caldwell Decl. ¶¶ 12(c), 13, 16.)  He does not testify that he reported the teasing he experienced when wearing royal blue shoes.  (*See id.* ¶ 18.)  He does not testify that he reported the complaints received about his music.

(*See id.* ¶ 7.)  Finally, he does not suggest that he reported his belief that his supervisor's requests for him to switch to the second shift were racially motivated.  (*See id.* ¶ 20.)  Under Ninth Circuit authority, Mr. Caldwell must show that he reported these incidents of purported racial harassment and that his supervisors or Boeing management responded inadequately.  *See Sines*, 2014 WL 1319789, at *5 ("To prevail, [the plaintiff] would have to prove that at a [sic] he reported sexual harassment (as opposed to non-actionable forms of harassment or other workplace complaints) to [his supervisor].  He would then have to prove that [his supervisor] did not respond adequately to his reports.").  Here, Mr. Caldwell has done neither.[8]  Accordingly, the court cannot consider declines to consider these specific events as a part of Mr. Caldwell's hostile work environment claim against Boeing.

    4.  <u>Mr. Caldwell's Remaining Work Place Harassment Complaints</u>

    Mr. Caldwell's remaining allegations involve two incidents with supervisors and three with co-workers, which he testifies he reported to a manager.  *See supra* § II.B.2(b), (d), (g), (j)-(k).  Those incidents involve:  (1) an occurrence on December 1, 2016, in which a Boeing employee began to imitate Mr. Caldwell's efforts to move large pieces of metal by "walking as a knuckle-dragging ape and making ape noises," and stated, "I can't

---

    [8] In his declaration, Mr. Caldwell states that he "reported many of these incidents not only to my manager, who did nothing, but to Human Resources, who unfortunately also did nothing."  (Caldwell Decl. ¶ 15.)  Such a generalized statement, however, does not prevent the entry of summary judgment.  Mr. Caldwell bears the burden of proof on the issue of reporting.  *See Sines*, 2014 WL 1319789, at *4.  Further, "[c]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence, are insufficient to create a genuine issue of material fact."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (internal quotation marks omitted) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)).

stand you blacks," while other Caucasian employees laughed (Caldwell Decl. ¶ 14); (2)

an incident in October 2016, and on other unspecified dates, when Mr. Hammond, the

team lead,[9] told Mr. Caldwell that he was afraid of him because that is how Mr.

Hammond was raised (*id.* ¶ 19);[10] (3) an instance in which Mr. Bogardus told Mr.

Caldwell that "'blacks' in the South ha[ve] a meth problem and they can't help it"[11] (*id.*

¶ 21); (4) Mr. Caldwell's exclusion from a water cooler in early 2017 (*id.* at ¶ 11); and

//

//

[9] "In general, an employer is vicariously liable for a hostile work environment created by a supervisor." *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 877 (9th Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus.*, 524 U.S. at 761. For purposes of analyzing Boeing's motion for summary judgment, the court assumes, but does not rule that Mr. Hammond constitutes Mr. Caldwell's supervisor for purposes of Title VII.

[10] Mr. Caldwell also testifies that Mr. Hammond would follow him around closely and "boss [him] around." (Caldwell Decl. ¶ 19.) However, the court agrees with Boeing that courts routinely hold that this sort of disagreement with Mr. Hammond's management style cannot form the basis of a hostile work environment claim. (*See* MSJ at 19-20 (citing *Sumera v. Lynch*, No 4:13-CV-01959-KAW, 2016 WL 368159, at *7 (N.D. Cal. Feb. 1, 2016) (finding that criticisms of work such as "'nitpicking' . . . do not give rise to a hostile work environment"); *White v. FedEx Corp.*, No. C04-00099 SI, 2006 WL 618591, at *9 (N.D. Cal. Mar. 13, 2006) (""[N]itpicking' does not rise to the level of creating a hostile work environment.").) This court does too.

[11] Mr. Caldwell also declares that Mr. Bogardus "often would say derogatory things about African Americans," but the only specific example Mr. Caldwell provides is the one referenced above to blacks in the South and "meth" use. (*See* Caldwell Decl. ¶ 21.) Like other such generalized statements in his declaration, the court concludes that this one does not create an issue of fact sufficient to withstand summary judgment. *See Hexcel Corp.*, 681 F.3d at 1063 ("Conclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence, are insufficient to create a genuine issue of material fact.")

(5) Mr. Caldwell's various altercations with Mr. Anderson at the basketball court in Boeing's gym in December 2015, February 13, 2016, and February 19, 2016 (*id.* ¶¶ 12(a)-(c)). The court must determine, viewing the evidence in the light most favorable to Mr. Caldwell, if these incidents occurred "because of his race" and if they were "sufficiently severe or pervasive" to alter the conditions of Mr. Caldwell's employment and create an abusive working environment. *See Manatt*, 339 F.3d at 798.

The court first considers the water cooler incident. *See supra* § II.B.2(j). Prior to discovery, the court stated that it had "no trouble concluding that a reasonable African American would consider the denial of access to a drinking fountain . . . to be deeply humiliating and permeated with racial animus." (5/8/18 Order (Dkt. # 31) at 17.) However, undisputed evidence revealed during the course of discovery demonstrates that: (1) the water cooler was designated for the 787 program (a program for which Mr. Caldwell did not work); and (2) numerous employees (including white employees) who were not a part of the 787 program were told that they could not use the 787 water cooler. (*See* Koahou Decl. ¶¶ 3, 6, 9; McNally Decl. ¶¶ 3, 6-7, 9.) Indeed, Mr. Caldwell acknowledges that he has no evidence that the office administrator who denied his access to the water cooler acted based on his race. (Caldwell Dep. at 239:17-240:3.) Thus, the court concludes that undisputed evidence demonstrates that this incident did not involve racial animus and no reasonable juror could conclude otherwise. *See, e.g.*, *Ellis v. SUNY Downstate Med. Ctr.*, No. 06-CV-2735, 2008 WL 11417051, at *4-*5 (E.D.N.Y. Sept. 4, 2008) (finding no relation to race where the African-American plaintiff was admonished

//

not to use the water cooler at a hospital that was reserved for patients and dismissing the hostile work-environment claim).

In addition to the water cooler incident, Mr. Caldwell's unfortunate interactions with Mr. Anderson on the basketball court are also racially neutral as described by Mr. Caldwell. There is no doubt that he subjectively viewed these events as "based on his race." *See Manatt*, 339 F.3d at 798; *see also* Caldwell Decl. ¶ 12(b) ("I *felt* this ['no dunking rule'] was racially motivated because the other players were Caucasian, and I never saw one of them who could dunk.") (italics added); *id.* ¶ 12(c) ("I *felt* like this was racial targeting because I recognized the security guards and I know they knew who I was.") (italics added). Yet, Mr. Caldwell's subjective view of the events is not sufficient. "[T]he working environment must both subjectively and objectively be perceived as abusive." *Vasquez*, 349 F.3d at 642. Neither Mr. Hammond, nor any of the security guards with whom Mr. Hammond interacts at the gym, ever referenced his race in any way during the incidents. (*See* Caldwell Decl. ¶¶ 12(a)-(c).) Mr. Caldwell presents no evidence to substantiate that his interactions with Mr. Anderson were objectively racially abusive. *See, e.g.*, *EEOC v. GNLV Corp.*, No. 2:06-CV-01225-RCJ, 2014 WL 7365871, at *33 (D. Nev. Dec. 18, 2014) (entering summary judgment for employer because there was "no evidence other than [the plaintiff's] suspicions that the guards' actions of asking for badges were motivated by race," and those suspicions fell "well short of establishing a hostile work environment based on severe or pervasive conduct of a racial nature").

What remains are three incidents in which Mr. Caldwell was subjected to the racially insensitive remarks of Mr. Bogardus and Mr. Hammond and the racially

offensive conduct of the ape-impersonating Boeing employee.  Even if the court were to include in its calculus the incidents involving Mr. Anderson and the security guards in the gym, there are insufficient allegations to sustain a hostile work environment claim at trial. The conduct that Mr. Caldwell alleges and that the court can consider is simply not "sufficiently severe or pervasive" to alter the conditions of Mr. Caldwell's employment and "create an abusive working environment."  *See Manatt v. Bank of Am.*, 339 F.3d at 795-803 (affirming dismissal of hostile work environment claim where the plaintiff alleged racially offensive statements, pantomimes, and gestures); *see Vasquez*, 349 F.3d at 643 (holding that "no reasonable jury could have found a hostile work environment" despite manifold allegations of racial discrimination, including "that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos," etc.); *Mangaliman v. Wahington State DOT*, No. CV11-1591 RSM, 2014 WL 1255342, at *10 (W.D. Wash. Mar. 26, 2014) (finding no hostile work environment and granting dismissal where the employee was called "dumb Filipino," yelled at by supervisors, "scrutiniz[ed]," and "subject[ed] to extensive performance testing").  Accordingly, the court grants Boeing's motion for summary judgment on Mr. Caldwell's hostile work environment claim.

//

//

//

//

//

# IV.    CONCLUSION

Based on the foregoing analysis, the court GRANTS Boeing's motion for summary judgment on all of Mr. Caldwell's remaining claims (Dkt. # 47).

Dated this 10th day of April, 2019.

JAMES L. ROBART
United States District Judge